**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PAUL OLSSON, | |
| Plaintiff, | |
| vs. | Case No. 17-CV-3028 |
| WAYNE BEYER, in his individual capacity; SHARON COLEMAN, in her individual capacity; JAMES CORCORAN, in his individual capacity; BRIAN DAWSON, in his individual capacity; JAMES T. DIMAS, in his official and individual capacity; DANIEL DYSLIN, in his individual capacity; BILL EPPERSON, in his individual capacity; ANDERSON FREEMAN, in his individual capacity; DEBBIE GIORDINA, in her individual capacity; DAVID HAEGERMAN, in his individual capacity; COMISSA HAMILTON, in her individual capacity; DANIEL HARDY, in his individual capacity; VICTORIA INGRAM, in her individual capacity; JEREMY JACKSON, in his individual capacity; MAUREEN JUNG-OLIVER, in her individual capacity; JOANNE LANGLEY, in her individual capacity; RICHARD MALIS, in his individual capacity; JEFFREY PHARIS, in his individual capacity; JEFFREY PILARIO, in his individual capacity; THOMAS ZUBIK, in his individual capacity; and ELGIN MENTAL HEALTH CENTER, an Illinois Agency. | Judge Manish S. Shah<br><br>JURY DEMAND |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff Paul Olsson ("Olsson"), by and through his attorneys, Honigman LLP, hereby

complains against Defendants brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983, seeking

damages, declaratory, and injunctive relief, for Defendants' violations of Olsson's constitutional

rights, including, *inter alia*, his First Amendment rights to free speech, vis-a-vie retaliating against

Olsson for acting as a jailhouse lawyer, and for denying Olsson access to the courts by denying him access to law libraries or legal assistance.

<u>**INTRODUCTION**</u>

1.      Olsson is currently a resident in the Elgin Mental Health Center ("EMHC"), and has been a resident at EMHC since 2007.  During this time, Olsson, having taken several paralegal classes, has assisted numerous fellow residents in preparing, drafting, and filing grievances and complaints, and at times assisted other residents with administrative proceedings such as, for example, to obtain social security benefits.  In addition, Olsson filed several complaints against various parties, including those now named as defendants in this case.  Moreover, Olsson was previously elected as the President of Consumer Council by his fellow residents to address grievances with EMHC.

2.      Upon information and belief, as retaliation against Olsson's actions acting as a jailhouse lawyer for fellow residents and for himself, for Olsson's attempts to exercise his First Amendment rights, and to frustrate lawsuits filed by Olsson, defendants have on numerous occasions, seized Olsson's duly approved property and electronic equipment, subjected Olsson to confinement within his unit, forced Olsson to withdraw from distance learning classes contrary to his treatment team's recommendation and to Olsson's financial detriment, banned Olsson's outside psychologist from EMHC's grounds, threatened and cut off all communications from Olsson's friends, as well as other retaliatory conducts, all without explanation to Olsson.  Despite Olsson's repeated and frequent filing of grievances in accordance with EMHC's procedures, these punishing conducts have continued.

3.      Furthermore, EMHC has failed, and continues to fail, to provide adequate legal resources or assistance to Olsson as guaranteed by Olsson's fundamental right of access to courts.

Indeed, EMHC's library only carries an incomplete and outdated copy of Illinois Compiled Statutes. EMHC does not have a copy of any rules of procedures, rules of evidences, court rules, or even a legal dictionary. Worse yet, the library's computer, which Olsson is no longer permitted to use, does not have access to any legal resources in a digital format. Moreover, upon information and belief, EMHC does not provide its residents with any alternative form of legal assistance. Accordingly, Olsson has had several cases dismissed for failure to follow the rules of civil procedure, failure to respond, and other procedural defects. Some of these cases may lead to Olsson's release, change his status to stand trial, or address other alleged civil rights violation.

4. In view of the forgoing, as filing more grievances would be futile, Olsson seeks to address the retaliatory conduct set forth in this First Amended Complaint and to gain access to adequate legal resources as guaranteed to him by his fundamental right to access the courts.

## THE PARTIES

5. Olsson is a citizen of Illinois, and currently a resident in the Elgin Mental Health Center ("EMHC").

6. Upon information and belief, Defendant Wayne Beyer is a citizen of the State of Illinois. Defendant Wayne Beyer is sued in his individual capacity and his official capacity as a Consumer Recovery Support Specialist of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. Defendant Wayne Beyer participated in the complained of misconduct and unconstitutional behavior.

7. Upon information and belief, Defendant Sharon Coleman is a citizen of the State of Illinois. Defendant Sharon Coleman is sued in her individual and her official capacity as Deputy Forensic Director of the Department of Human Services during the times pertinent hereto,

employed by the Department of Human Services, and was acting under color of law and within the scope of her employment at all times relevant to this First Amended Complaint. Defendant Sharon Coleman participated in the complained of misconduct and unconstitutional behavior.

8. Upon information and belief, Defendant James Corcoran is a citizen of the State of Illinois. Defendant James Corcoran is sued in his individual capacity and his official capacity as the medical director for the State of Illinois during the times pertinent hereto, employed by the State of Illinois, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. Defendant James Corcoran participated in the complained of misconduct and unconstitutional behavior.

9. Upon information and belief, Defendant Brian Dawson is a citizen of the State of Illinois. Defendant Brian Dawson is sued in his individual and his official capacity as an administrator of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. Defendant Brian Dawson participated in the complained of misconduct and unconstitutional behavior.

10. Upon information and belief, Defendant James T. Dimas is sued in his individual and official capacity as the Secretary of Department of Human Services, who currently exercises supervisory control over EMHC.

11. Upon information and belief, Defendant Daniel Dyslin is a citizen of the State of Illinois. Defendant Daniel Dyslin is sued in his individual capacity and his official capacity as the general counsel of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First

Amended Complaint. Defendant Daniel Dyslin participated in the complained of misconduct and unconstitutional behavior.

12.     Upon information and belief, Defendant Bill Epperson is a citizen of the State of Illinois. Defendant Bill Epperson is sued in his individual capacity and his official capacity as the chief of security of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. Defendant Bill Epperson participated in the complained of misconduct and unconstitutional behavior.

13.     Upon information and belief, Defendant Anderson Freeman is a citizen of the State of Illinois. Defendant Anderson Freeman is sued in his individual Capacity and his official capacity as the Forensic Director of the Department of Human Services during the times pertinent hereto, employed by the Department of Human Services, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. Defendant Anderson Freeman participated in the complained of misconduct and unconstitutional behavior.

14.     Upon information and belief, Defendant Debbie Giordina is a citizen of the State of Illinois. Defendant Debbie Giordina is sued in her individual capacity and her official capacity as a Social Worker and evaluator of security status of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of her employment at all times relevant to this First Amended Complaint. Defendant Debbie Giordina participated in the complained of misconduct and unconstitutional behavior.

15.     Upon information and belief, Defendant David Haegerman is a citizen of the State of Illinois. Defendant David Haegerman is sued in his individual capacity and his official capacity

as a librarian of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. Defendant David Haegerman participated in the complained of misconduct and unconstitutional behavior.

16.     Upon information and belief, Defendant Comissa Hamilton is a citizen of the State of Illinois. Defendant Comissa Hamilton is sued in her individual and her official capacity as the former Forensic Program Director of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of her employment at all times relevant to this First Amended Complaint. Defendant Comissa Hamilton participated in the complained of misconduct and unconstitutional behavior.

17.     Upon information and belief, Defendant Daniel Hardy is a citizen of the State of Illinois. Defendant Daniel Hardy is sued in his individual capacity and his official capacity as the Medical Director of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. On information and belief, Defendant Daniel Hardy was the direct supervisor of Defendant Richard Malis during the events herein complained.

18.     Upon information and belief, Defendant Victoria Ingram is a citizen of the State of Illinois. Defendant Victoria Ingram is sued in her individual capacity and her official capacity as Acting Program Director and Director, Court Services of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of her employment at all times relevant to this First Amended Complaint. Defendant Victoria Ingram participated in the complained of misconduct and unconstitutional behavior.

19.     Upon information and belief, Defendant Jeremy Jackson is a citizen of the State of Illinois.  Defendant Jeremy Jackson is sued in his individual capacity and his official capacity as a Security Officer of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint.  Defendant Jeremy Jackson participated in the complained of misconduct and unconstitutional behavior.

20.     Upon information and belief, Defendant Maureen Jung-Oliver is a citizen of the State of Illinois.  Defendant Maureen Jung-Oliver is sued in her individual capacity and her official capacity as a social worker of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of her employment at all times relevant to this First Amended Complaint.  Defendant Maureen Jung-Oliver participated in the complained of misconduct and unconstitutional behavior.

21.     Upon information and belief, Defendant Joanne Langley is a citizen of the State of Illinois.  Defendant Joanne Langley is sued in her individual and her official capacity as an administrator of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of her employment at all times relevant to this First Amended Complaint.  Defendant Joanne Langley participated in the complained of misconduct and unconstitutional behavior.

22.     Upon information and belief, Defendant Richard Malis is a citizen of the State of Illinois.  Defendant Richard Malis is sued in his individual capacity and his official capacity as the medical director and psychiatrist of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint.  Upon information and belief, Defendant Richard Malis

issues disciplinary actions and participates in decision making pertaining to the unconstitutional disciplinary process that is the subject of this First Amended Complaint.

23. Upon information and belief, Defendant Jeffrey Pharis, now retired, is a citizen of the State of Illinois. Defendant Jeffrey Pharis is sued in his individual capacity and his official capacity as the former Forensic Director of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. Defendant Jeffrey Pharis was the direct supervisor of at least Defendants Jeffrey Pilario, David Haegerman, Bill Epperson, Maureen Jung-Oliver, Debbie Giordina, and Jeremy Jackson during the events herein complained.

24. Upon information and belief, Defendant Jeffrey Pilario is a citizen of the State of Illinois. Defendant Jeffrey Pilario is sued in his individual capacity and his official capacity as a nurse manager of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. Upon information and belief Defendant Jeffrey Pilario issues disciplinary actions at the EMHC and participates in decision making pertaining to the disciplinary process that is the subject of this complaint.

25. Upon information and belief, Defendant Thomas Zubik is a citizen of the State of Illinois. Defendant Thomas Zubik is sued in his individual capacity and his official capacity as the Forensic Program Director of the EMHC during the times pertinent hereto, employed by the EMHC, and was acting under color of law and within the scope of his employment at all times relevant to this First Amended Complaint. Defendant Thomas Zubik participated in the complained of misconduct and unconstitutional behavior.

26.     Defendant Elgin Mental Health Center is a mental health facility located in Elgin, Illinois and operated by the Illinois Department of Health and Human Services. Each of the aforementioned Defendants are either employed by EMHC or serve/have served EMHC.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Judicial Code 28 U.S.C. § 1331 and § 1343(a); and the Constitution of the United States.

28.     This Court has personal jurisdiction over Defendants because each of the aforementioned Defendants are either a citizen and/or resident of the State of Illinois.

29.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)-(c) because a substantial part of the events giving rise to Olsson's claims occurred in this District and because Defendants are subject to personal jurisdiction here.

## PATTERN OF RETALIATION

### Retaliation In Connection With Olsson's
### Involvement And Assistance With Larry Banks' Lawsuit

30.     Olsson is currently a resident at EMHC, and has been a resident at EMHC since 2007.

31.     Olsson has assisted residents at EMHC throughout his time at EMHC, due to Olsson having taken several paralegal classes from 2010-2012, Olsson has actively assisted numerous residents by offering them legal assistance. It is commonly known among EMHC staff and residents that Olsson assists fellow residents with their legal needs.

32.     On or around January 2008, Olsson began assisting a fellow resident in the EHMC, Larry Banks, in drafting and filing lawsuits. By way of example, Olsson has assisted Banks with the preparation and filing of numerous cases, including *Henderson v. McDonald*, No. 94-C-0055

(N.D. Ill., Hart., J.), *Larry Maurice Banks, Inc. v. Elgin Mental Health Center et al.*, No. 07-cv-5654 (N.D. Ill., Dow, J.), *Banks v. Abraham et al.*, No. 08-cv-2468 (N.D. Ill., Hibbler, J.).

33. Shortly after Olsson began assisting Banks with Banks' lawsuits, Defendants Pharis and Hardy ordered that Olsson and Banks be housed in separate units.

34. Upon information and belief, Defendants Pharis and Hardy had no legitimate basis to separate Olsson and Banks into separate units except as a retaliation against Olsson for acting as a jailhouse lawyer for Banks, and to frustrate the litigation proceeding between Banks and the EMHC.

**Retaliation In Connection With Olsson's**
**Involvement and Assistance With Abby Grason's 2015 Civil Rights Lawsuit**

35. From 2013 until 2015, Olsson resided in the same housing unit as Abby Grason.

36. During this time, Olsson assisted Grason in preparing and submitting numerous grievances regarding Grason's medical treatments.

37. Upon information and belief, on or around August 2015, Grason informed her psychiatrist, Dr. Ulsa Kartan, that she was planning on suing her treatment team with Olsson's assistance.

38. Shortly thereafter, Olsson was summoned into a meeting with, *inter alia*, Defendants Jeffrey Pilario, Maureen Jung-Oliver, Debbie Giordina, Richard Malis, Jeffrey Pharis, and Daniel Hardy.

39. During this meeting, Olsson was informed that he was going to be transferred to a different housing unit separate from Grason.

40. In response to inquiries from Olsson as to why he was being separated from Grason, Hardy informed Olsson that "Springfield" was involved in the decision to move him.

41.     Upon information and belief, by "Springfield," Hardy was referring to, *inter alia* Defendants Freeman, Coleman, and Dyslin as they exercised direct supervision over EMHC.

42.     Upon information and belief, Defendant Dr. Joanne Langley was the administrator at EMHC at this time and would have also participated in the decision of said separation.

43.     On or around November 2015, Grason filed her civil rights complaint against numerous Defendants. *Grason v. Hardy et al*, No. 1:15-cv-09290 (N.D. Ill., Chang, J.). In the complaint for said case, Grason stated that Olsson was a person assisting her with her lawsuit. *See id*. at Civil Rights Complaint (D.I. 1) at para. 232-234. Upon information and belief, Grason's lawsuit was recently settled. *See id.* at Minute Entry (D.I. 88).

44.     Upon information and belief, Defendants had no legitimate basis to separate Olsson and Grason into separate housing units except as a retaliation against Olsson for acting as a jailhouse lawyer for Grason, and to frustrate Grason's litigation proceeding.

**Retaliation In Connection With Olsson's**
**Involvement And Assistance With Abby Grason's 2016 Social Security Proceeding**

45.     On or around November 2016, Olsson was approached by Grason. Grason informed Olsson that her treatment team opined that she was no longer a threat to herself or to others and she had been accepted into a group home. However, Grason stated that her treatment team was refusing to seek her release because her social security application was denied.

46.     At Grason's request, Olsson agreed to represent Grason in her social security proceeding. Thereafter, Grason executed the required paperwork in order for Olsson to represent her in the social security proceeding. Olsson was informed over the phone that he was approved to represent Grason.

47.     After reviewing Grason's medical records and applicable rules, Olsson submitted a detailed brief on behalf of Grason. On February 9, 2017, Olsson and Grason appeared via

telephone for the hearing in front of an administrative law judge. The ALJ subsequently ruled in favor of Grason.

48. Shortly after the hearing, Olsson was informed by multiple staff members that the administration was furious at Olsson for representing Grason in the aforementioned proceeding.

49. At the relevant time, Defendants Ingram and Hardy were the administrators at EMHC, and were directly supervised by Defendants Daniel Dyslin, Anderson Freeman and Sharon Coleman.

50. Approximately two (2) weeks after Grason's social security hearing and just days after learning of administration's displeasures toward Olsson, Defendants Victoria Ingram, Bill Epperson, Brian Dawson and others seized Olsson's previously-approved personal digital assistant (PDA) without providing any reason for its seizure.

51. Upon information and belief, Defendant Jeffrey Pharis previously personally reviewed and approved Olsson's PDA, informing Olsson that "I have no legitimate reason to deny it."

52. At the time of its seizure, Olsson possessed the PDA for more than 120 days since it was approved by Pharis.

53. Olsson utilized his PDA to store documents he prepared for Grason's social security hearing, in addition to his notes and Grason's confidential medical records.

54. Defendants Sharon Coleman, Anderson Freeman and Daniel Dyslin provided multiple, inconsistent, and changing statements for the reasoning behind the seizure of Olsson's previously-approved PDA. Soon thereafter, Defendants Sharon Coleman, Anderson Freeman and Daniel Dyslin falsely accused Olsson of violating privacy laws by "recording another patient" with

his PDA despite Olsson repeatedly demonstrating that his PDA had no such capabilities and that Pharis would not have approved the PDA should the PDA have possessed such capabilities.

55.     During his stay at EMHC, Olsson has been allowed to possess various electronic devices pursuant to applicable policies.  Including but not limited to:  Computers, Flash Drives, Memory Cards, External Hard Drives, PDA, Video Game Consoles, and MP3 Players.

56.     Upon information and belief, unless a specific device is explicitly banned pursuant to EMHC's list of contrabands, a resident is generally permitted to possess personal property.

57.     Upon information and belief, Defendants had no legitimate basis to seize Olsson's previously-approved PDA, except as a retaliation against Olsson for acting as a jailhouse lawyer for Grason.

## Retaliation In Connection With Olsson's 2017 Lawsuits

58.     In June 2017, Olsson, together with other residents at EMHC, filed two lawsuits against numerous defendants, including this proceeding.  *Nadzhafaliyev et al v. Hardy et al*, No. 1:17-cv-04469 (N.D. Ill., Alonso, J.); *Olsson v. Pharis*, et al, No. 1:17-cv-03028 (N.D. Ill., Shah, J.).

59.     At the time of filing, Olsson was the President of the Consumer Council at EMHC, representing his fellow residents at EMHC.

60.     The Consumer Council is a bi-monthly meeting with EMHC staff where elected residents from each unit attend.  Olsson was elected by his peers in his housing unit to represent his unit and by the elected peers from other units to serve as the President of said Council.

61.     The Consumer Council serves a critical function at EMHC by giving residents a forum to directly address problems with EMHC's administration and to seek resolutions without judicial interventions.

62.     Shortly after the aforementioned two lawsuits were filed, Olsson—as the President of the Consumer Council—distributed copies of the complaints at a Consumer Council meeting for the unit representatives to take back to their respective units.  Olsson asked that the complaints be posted on resident-maintained bulletin boards in order to inform residents about the ongoing legal matters that directly affected their rights and conditions.

63.     Upon information and belief, on multiple occasions, Defendants Jeffrey Pharis and Daniel Dyslin had stated during Consumer Council meetings that the Consumer Council was the appropriate venue for residents to distribute legal documents.

64.     Nonetheless, an EMHC employee and the co-facilitator of Consumer Council meetings, Wayne Beyer, Consumer Recovery Support Specialist, became visibly agitated and demonstrated said agitation by fidgeting in his chair and growing red in the face.

65.     Beyer told the Council that he did not approve of the legal actions that Olsson and other residents filed, and that Olsson and other residents should not be filing lawsuits or complaints.

66.     Beyer consistently voiced his strong disapproval over residents writing grievances, petitions, and lawsuits.  Beyer threaten Olsson, as well as other residents, that engaging in the aforementioned activity will "prolong their stay."

67.     Upon information and belief, by assisting other residents as a jailhouse lawyer, it adversely affected Olsson's evaluation and indeed "prolong[ed] [his] stay."

68.     During an earlier Consumer Council meeting, Olsson distributed a memo he wrote to fellow residents, informing them of a potential structural error in which their substantive due-process rights may be violated.

69.    Beyer displayed the same visible agitation, declared to the residents that these actions were contrary to their treatments, and implied that anybody who engaged in these endeavors was doing themselves harm.

70.    Upon information and belief, Beyer told the residents not to fight for their rights, but to trust their treatment teams instead.

71.    Beyer's statement, and the fact that he was acting as EMHC's agent, demonstrated that EMHC sought to create a hostile environment to any resident who dared to seek judicial interventions to redress their perceived violation of rights, by threatening to retaliate by "prolonging their stay."

72.    Furthermore, Olsson was informed by another EMHC employee, Bob Price, that the administration, especially Defendant Brian Dawson, was very upset at Olsson for filing the lawsuits, then passing the complaints out to other units.  Olsson was told that Dawson ordered all units to remove any legal documents or notices from their bulletin boards.

73.    On July 20, 2017 at around 3:30 p.m., four security guards came to Olsson's room and informed Olsson that they had been ordered by the administration to confiscate all of Olsson's previously-approved electronics, including his pre-approved desktop that he used for distant learning.

74.    The security guards refused to tell Olsson why his property was being seized, but merely told him that Defendant Bill Epperson issued the order.

75.    The following morning, on July 21, 2017, Olsson asked Epperson why his property was seized and for how long.  Epperson refused to answer Olsson's questions directly, but cryptically answered that the order came from "way up high."  Olsson followed up by asking whether Epperson was referring to Springfield, to which Epperson responded in the affirmative.

76.     Later that morning, Olsson went to the library to meet with Grason to assist her in a legal matter.  Shortly after arriving, librarian, Defendant David Haegerman, ordered Olsson to return to his housing unit.

77.     Upon returning to his unit, a dozen security guards arrived and informed Olsson that he was restricted to his unit until further notice.  Olsson asked Defendant Jeremy Jackson why he was being confined to his unit but Jackson refused to answer.

78.     In addition, Jackson also denied Olsson's requests to attend religious services or to attend visits with Olsson's family without providing any reason for their denial.

79.     Upon information and belief, in view of Olsson's confinement, Olsson's assigned social worker also expressed outrage at the situation because facility policy and procedure was not being followed.

80.     During Olsson's confinement, he was denied access to his prescribed treatment groups of which Olsson had a perfect attendance record and led many of said treatment groups.

81.     Similarly, Olsson was prescribed off unit exercise as a treatment for his iatrogenic depression and anxiety disorders.  The aforementioned confinement also worsened Olsson's pre-existing conditions.

82.     In addition, Olsson was removed as the President of the Consumer Council, a position of which he was duly elected by his fellow residents.

83.     Olsson's unit restriction lasted approximately 75 days.

84.     Despite numerous grievances filed by Olsson regarding the seizure of his property and the unit confinement, Defendants have yet responded to Olsson's grievances to date, contrary to even EMHC's own policies in addressing grievances.

85.     Upon information and belief, Defendants had no legitimate basis to seize Olsson's previously-approved property and to impose upon him a unit restriction, except as a retaliation against Olsson for acting as a jailhouse lawyer for fellow residents and for himself, for Olsson's exercising his First Amendment rights addressing matters of public concerns, and to frustrate litigation proceedings filed by Olsson.

### Subsequent Retaliatory Conduct—Removal From Distant Learning Program

86.     Multiple treatment teams, including Dr. Mannix, over the years recommend Olsson to take continuing education classes and referred him to a distance learning program as part of his treatment.

87.     Upon information and belief, Defendant Dr. Malis was also supportive of having Olsson take a distance learning program as part of Olsson's treatment.

88.     Through the distance learning program, Olsson attended college classes at multiple colleges. At the time of his aforementioned unit restriction, Olsson had been attending Colorado Technical University with a 4.00 GPA.

89.     In order to pay for his college classes, Olsson took out a student loan totaling approximately $22,000.

90.     During the aforementioned unit restriction, Defendant Dawson allowed Olsson only one hour a day to conduct his school work.

91.     Furthermore, during Olsson's unit restriction, he was also placed on so-called "one-to-one" status, where EMHC personnel supervised his actions at all times.

92.     Upon information and belief, Dawson and other Defendants knowingly placed Olsson in a circumstance where Olsson would be unlikely to succeed in his distance learning

program in order to stop Olsson from filing lawsuits and from acting as a jailhouse lawyer for his fellow residents.

93.     On September 14, 2017, Olsson was doing school work in the one hour time span allotted.  Defendants Comissa Hamilton and Bill Epperson entered the distance learning lab where Olsson was learning and studying, ordered Olsson off the computer, and told Olsson that his distance learning program was being terminated.

94.     Olsson asked for a reason but Defendants refused to answer Olsson's questions.

95.     Upon information and belief, Olsson's treatment team also asked for a reason as to the termination of Olsson's distant learning program but was not provided with an answer.

96.     On or about September 15, 2017, Olsson met with, *inter alia*, Defendant Victoria Ingram, who informed Olsson that she just came from a conference call with Springfield regarding Olsson.  Olsson inquired about the status of his property seizure, unit restriction and removal from distance learning, but Ingram refused to provide an answer.

97.     Upon information and belief, due to being forcibly removed from the distance learning program, the repayment for his student loan was triggered and Olsson has thereby suffered financial damages in the form of loan defaults.

98.      Upon information and belief, Defendants had no legitimate basis to withdraw Olsson from his prescribed distant learning program except as a retaliation against Olsson for acting as a jailhouse lawyer for fellow residents and for himself, for Olsson's exercising his First Amendment rights addressing matters of public concerns, and to frustrate litigation proceedings filed by Olsson.

### Subsequent Retaliatory Conduct—Banning Olsson's Outside Psychologist

99.     For approximately one year, Olsson exercised his right to have an outside psychologist, Dr. Mannix, attend his treatment meetings.

100.     Upon information and belief, Dr. Mannix completed a case study on Olsson and wished to present evidence that would entitle Olsson to be released.

101.     During the same one year period, Defendant Daniel Hardy repeatedly obstructed Dr. Mannix and Olsson's efforts to present evidence that would lead to Olsson's release.

102.     Shortly after Olsson filed this case and *Nadzhafaliyev et al v. Hardy et al* aforementioned, Defendants Victoria Ingram and Jeffrey Pilario met with Olsson and informed Olsson that Dr. Mannix was thereafter banned from EMHC.

103.     Olsson objected and inquired as to why Dr. Mannix was banned, to which Ingram did not directly respond, but stated that Defendant James Corcoran and "Springfield" decided to ban Dr. Mannix.

104.     Upon information and belief, Defendants had no legitimate basis to ban Olsson's outside psychologist, Dr. Mannix, except as a retaliation against Olsson for acting as a jailhouse lawyer for fellow residents and for himself, for Olsson's exercising his First Amendment rights, and to frustrate litigation proceedings filed by Olsson.

### Subsequent Retaliatory Conduct—Denial Of Security Status Review

105.     On or about May 2018, Olsson requested a second level review to determine if medium security status was the least restrictive suitable for Olsson.

106.     Defendants Tom Zubik and James Corcoran met with Olsson in June of 2018. During the meeting, they informed Olsson that he can go to a minimum security unit if he waived his right and submitted to an evaluation.

107.    Olsson objected and told Zubik and Corcoran that he was willing to submit to an evaluation, but must consult with an attorney before waiving his rights.

108.    Upon information and belief, Olsson met the requirements for placement in a minimum security unit at the time.

109.    Upon information and belief, other patients at the time were granted similar requests without having to waive their rights.

110.    Upon information and belief, at the time, Defendant Debbie Giordina was in charge of the security status review process.

111.    Upon information and belief, Defendants Brian Dawson, Victoria Ingram, Daniel Dyslin, Sharon Coleman, Debbie Giordina and Richard Malis instructed Zubik and Corcoran to reject Olsson's request, and exercised direct supervision over Zubik and Corcoran at the time.

112.    Upon information and belief, Defendants had no legitimate basis to deny Olsson's request for a review to determine security status except as a retaliation against Olsson for acting as a jailhouse lawyer for fellow residents and for himself, for Olsson's exercising his First Amendment rights, and to frustrate litigation proceedings filed by Olsson.

**Subsequent Retaliatory Conduct—Denial Of Previously-Approved Property**

113.    Since the filing of this case, Olsson has had property requests delayed or denied arbitrarily by EMHC.

114.    Upon information and belief, Defendants Bill Epperson and Jeffrey Pilario, with the direct approval and supervision of Richard Malis, Brian Dawson, Tom Zubik, and Sharon Coleman, arbitrarily denied Olsson from having various electronic items arbitrarily, notwithstanding EMHC's own policies.

115. On or about August 2018, Olsson was arbitrarily denied various cables including headphone cables, HDMI, and coaxial cables.

116. These items have previously been approved for Olsson to possess, but since the filing of this action, Defendants have denied Olsson's requests to such items.

117. Upon information and belief, Defendants Maureen Jung-Oliver and Jeffrey Pilario, with the direct approval and supervision of Richard Malis, Brian Dawson, Tom Zubik, and Sharon Coleman, arbitrarily denied Olsson from having previously-approved property, notwithstanding EMHC's own policies.

118. Upon information and belief, Defendants had no legitimate basis to deny Olsson's previously-approved property, contrary to EMHC's own policies, except as a retaliation against Olsson for acting as a jailhouse lawyer for fellow residents and for himself, for Olsson's exercising his First Amendment rights, and to frustrate litigation proceedings filed by Olsson.

### Subsequent Retaliatory Conduct—Infliction of Emotional Distress

119. On or around May 2018, EMHC removed a fellow resident from Olsson's housing unit over the objection of said resident's treatment team, whom Olsson was romantically involved with at the time.

120. Olsson was friends with this particular resident for many years, they were in the same housing unit, and were in a long-term committed relationship with each other.

121. Upon information and belief, EMHC does not discourage nor prohibit residents from having relationships with one another.

122. Olsson assisted said resident with getting her social security approved and were in the process of discussing other causes of actions for a lawsuit on behalf of said resident.

123.     Upon information and belief, around September 2018, Defendants Maureen Jung-Oliver and Richard Malis threatened this resident, both directly and indirectly, that if she continued associating with Olsson, she would not be released.

124.     Upon information and belief, Defendants knew this resident was a foundation of Olsson's peer support network and knowingly obstructed this relationship as a retaliation against Olsson for filing this lawsuit and for assisting others by acting as a jailhouse lawyer.

125.     Furthermore, upon information and belief, Defendants similarly threatened other friends of Olsson for being associated with Olsson.

126.     As a direct result of Defendants' conducts, Olsson's friends have cut off all forms of communication with Olsson, resulting in severe depression and emotional distress to Olsson.

127.     Olsson is currently undergoing medical treatment for his depression.

128.     Upon information and belief, Defendants had no legitimate basis to threaten Olsson's friends from being associated with Olsson, except as a retaliation against Olsson for acting as a jailhouse lawyer for fellow residents and for himself, for Olsson's exercising his First Amendment rights, and to frustrate litigation proceedings filed by Olsson.

**Subsequent Retaliatory Conduct—Denial Of Library Computer Access**

129.     On or about June 2018, librarian, Defendant David Haegerman, informed Olsson that he could no longer use the computer in the library at EMHC.

130.     At the time, Olsson just drafted a petition for release at the request of his roommate the previous day.

131.     The librarian, Haegerman told Olsson that Defendant Zubik instructed him to prevent Olsson from using the library computers.

132.    Olsson asked if he violated any rules regarding library computers, to which Haegerman replied no.

133.    Upon information and belief, Defendants had no legitimate basis to deny Olsson from accessing the library computers, except as a retaliation against Olsson for acting as a jailhouse lawyer for fellow residents and for himself, for Olsson's exercising his First Amendment rights, and to frustrate litigation proceedings filed by Olsson.

### DENIAL OF ACCESS TO COURT—
### LACK OF LAW MATERIALS AND LEGAL ASSISTANCE

134.    On or around June 2018, Olsson had been denied access to use the computers at EMHC's library.

135.    Even with access to these computers, the computers at EMHC's library do not have internet access capabilities, and certainly do not have the ability to access any free or subscription-based legal databases, such as Westlaw, Lexis, or Google Scholar.

136.    At most, the computers at EMHC's library are only capable of word processing, together with other non-legally related functions such as games and playing music.

137.    Upon information and belief, EMHC library has a grossly inadequate collection of legal resources.  It contains only an incomplete and outdated collection of Illinois Compiled Statutes from 2016.

138.    Upon information and belief, EMHC's library does not possess any copy of the rules of procedures, the rules of evidences, or even a legal dictionary.

139.    Upon information and belief, as a resident at EMHC, Olsson is unable to look up any cases, orders, or rules from the EMHC library.

140.    Upon information and belief, although the librarians at EMHC library had the capability to access the internet, they were ordered to deny Olsson's requests to print out any legal related materials.

141.    Upon information and belief, the no legal research policy was implemented on the order of Defendant Jeffrey Pharis who oversaw all forensic personal at EMHC.

142.    Upon information and belief, EMHC does not provide legal assistance of any form to its residents.  It does not provide legal aids, or provide access to a lawyer in any way.

143.    In at least one instance, a judge in this District previously determined that "[EMHC] provide[d] neither a law library nor legally trained personnel to assist [persons who are confined following being found not guilty by reason of insanity] in the filing of their petitions.  Absent some other adequate assistance, defendants fail to provide meaningful access."  *Henderson v. Handy*, No. 94-C-0055, 1996 WL 148040, at *6 (N.D. Ill. Mar. 29, 1996, Hart, J.).

144.    Upon information and belief, although an organization known as "Equip for Equality" is associated with EMHC, they provide advocacy for the residents as a whole and cannot represent residents individually.

145.    As a result, the only way for Olsson to access any cases or legal documents was to request his father to put the cases on a CD, provide Olsson with said CD, then Olsson would copy the cases onto a computer.

146.    Upon information and belief, Olsson has been unable to assist residents from prosecuting claims, in addition to his own claims, due to EMHC's lack of adequate legal materials and/or services.

147.    Upon information and belief, due to this lack of legal resources, Olsson has had several cases dismissed for procedural failures, including cases involving other civil rights

violation allegations and cases to overturn Olsson's "Unfit to Stand Trial" status, including at least *Olsson v. Dawson*, No. 18-mr-365 (Kane Co. Cir. Ct.) (pertaining to judicial review of administrative decisions), *Olsson et al. v. Zubik et al.*, No. 18-mr-1182 (Kane Co. Cir. Ct.) (pertaining to conditions of confinement), *Olsson v. Corcoran et al.*, 18-mr-1186 (Kane Co. Cir. Ct.) (pertaining to conditions of confinement), *People v. Olsson*, No. 05-CF-3046 (Ill. App. Ct. 2nd Dist., No. 2-09-0973) (pertaining to status to stand trial), *Olsson v. Jung-Oliver et al.*, No. 18-cv-7084 (N.D. Ill., Blakey, J.) (pertaining to conditions of confinement).

## EXHAUSTION

148.    Olsson has presented Defendants with numerous amounts of grievances pertaining to the aforementioned conduct and conditions.

149.    Defendants have acknowledged and agreed with Olsson's grievances and demands but have failed or refused to make any meaningful corrective change.

150.    Olsson routinely filed grievances that never received responses other than "will look in to," which has not yet led to any follow-up action or review.

151.    Defendants' grossly inadequate grievance system forfeits any requirements of exhaustion arguments or defenses hereto.

152.    Filing any additional grievances to address the aforementioned conducts and conditions would be futile.

153.    Defendant's statements and actions, as set forth above, show that there is a substantial controversy—between parties having adverse legal interests—of sufficient immediacy and reality to warrant judicial intervention.

## COUNT I

### RETALIATION FOR EXERCISING
### FIRST AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983

154.    Olsson reincorporates and re-alleges the allegations of the above paragraphs as if fully set forth herein.

155.    Olsson was engaging in constitutionally protected speech or conduct, including, *inter alia*, acting as a jailhouse lawyer for fellow residents and for himself, and speaking on matters related to the rights of other residents as the President of the Consumer Council and in his personal capacity.

156.    Defendants took adverse actions against Olsson for engaging in at least said protected speeches and conducts.

157.    Defendants provided no explanation for any of their adverse action, and had no legitimate basis for any of these actions, except as a retaliation against Olsson for exercising his First Amendment rights.

158.    Defendants' adverse actions were sufficient to deter a person of ordinary firmness from exercising their rights.

159.    In view of the forgoing, Olsson requests that this Court enter judgment against Defendants, awarding damages, declaratory, and injunctive relief, attorneys' fees and costs, and any other relief this Court deems just and appropriate.

## COUNT II

### DENIAL OF FIRST AMENDMENT PROTECTION
### ACCESS TO COURTS UNDER 42 U.S.C. § 1983

160.    Olsson reincorporates and re-alleges the allegations of the above paragraphs as if fully set forth herein.

161.    As a result of Defendants' failure to provide Olsson with adequate legal resources, Defendants have hindered Olsson's efforts to pursue a legal claim by having some of Olsson's cases dismissed for failure to satisfy some technical requirements and stymied other actionable harms that Olsson wished to pursue, including cases to appeal Olsson's fitness to stand trial status, and other civil rights actions involving conditions at EMHC.

162.    In view of the forgoing, Olsson requests that this Court enter judgment against Defendants, awarding damages, declaratory, and injunctive relief, attorneys' fees and costs, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and grant the following relief:

a.  Order Defendants to cease any and all retaliatory conducts against Olsson.

b.  Order Defendants to return any previously-approved, but later seized, property to Olsson to which Defendants failed to provide a legitimate reason for their seizure.

c.  Declare that Defendant EMHC failed to provide adequate legal resources or assistance as required under the First Amendment, and order Defendant to immediately rectify said deficiencies.

d.  Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

e.  Award compensatory damages, punitive damages, and any additional relief as the Court may deem appropriate and just under the circumstances.

March 15, 2019                                              Respectfully submitted,


                                                           By: */s/ Christopher E. Hanba*
                                                                Christopher E. Hanba (6298424)
                                                                Honigman LLP
                                                                155 North Wacker Drive Suite 3100
                                                                Chicago, IL 60606-1734
                                                                Telephone:  312-701-9329

                                                                YiKai Chen (6320434)
                                                                Honigman LLP
                                                                315 East Eisenhower Parkway
                                                                Suite 100
                                                                Ann Arbor, MI 48108-3330
                                                                Telephone:  734-418-4200