UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PAUL OLSSON,

            Plaintiff,

    v.

WAYNE BEYER, et al.,

            Defendants.

No. 17 CV 3028

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Paul Olsson has been found unfit to stand trial in a state criminal prosecution and committed to the Elgin Mental Health Center. In this case, one of several he has filed or tried to file over the years, he sued fourteen Elgin employees and former employees, as well as three employees and former employees of the Illinois Department of Human Services. He alleges that defendants denied him access to the courts and retaliated against him for filing lawsuits and helping others file lawsuits. Defendants moved for summary judgment on all claims. The motion is granted in part and denied in part.

I.    **Legal Standard**

Summary judgment is proper when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I construe all facts and reasonable inferences in favor of Olsson, the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). But the moving party is entitled to summary judgment when the nonmoving party fails to make "a

sufficient showing on an essential element" of his case for which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Local Rule 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). The rule requires the moving party to file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a)(3). The nonmoving party must file a response to that statement and may provide a separate statement of additional facts. *Petty*, 754 F.3d at 420; N.D. Ill. Local R. 56.1(b)(3). Both statements of facts and statements of additional facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* N.D. Ill. Local R. 56.1(d)(1)–(2). Evidence supporting or opposing summary judgment must be admissible if offered at trial, although depositions and other written testimony can substitute for live testimony. *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 460 (7th Cir. 2014).

Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). If the responding party disagrees with the other party's fact, it must cite specific parts of the record disputing the fact and "concisely explain how the cited material controverts the asserted fact." N.D. Ill. Local R. 56.1(e)(3). Facts that a party raises in a Local Rule 56.1 response that do not controvert the asserted fact, and that are not included in the party's statement of additional facts, are stricken. N.D. Ill. Local R. 56.1(e)(2). So

2

are facts that are supported only by inadmissible evidence, provided the opposing party objects on that basis. *Widmar*, 772 F.3d at 460. I also disregard legal arguments in the statement of facts. *See* N.D. Ill. Local R. 56.1(d)(4).

Olsson did not abide by Local Rule 56.1 in his response to defendants' statement of facts. In his denials of some of defendants' facts, Olsson consistently cites to his own statement of additional facts, instead of directly to the exhibits that he says contradict defendants' facts. *See* [197] ¶¶ 10, 11, 26, 68, 87, 88, 90, 96, 111, 112, 113, 114, 120, 123, 124, 127, 145, 174, 176.[1] In one instance, plaintiff cites to the entirety of his statement of additional facts (he seems to have accidentally left out the paragraph number, despite including a paragraph symbol). [197] ¶ 124. In another instance, plaintiff provides no citation at all. [197] ¶ 146. Although plaintiff's consistent citations to his additional statement of facts—as opposed to the record directly—violate Local Rule 56.1, I consider them when the additional statement of facts itself offers appropriate direct record citations.

Olsson also responds to some of defendants' assertions by saying they are "incomplete." *See* [197] ¶¶ 87, 90, 111, 112, 113, 145. But saying something is

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Olsson's response to defendants' Local Rule 56.1 statement, [197], and defendants' response to Olsson's statement of additional material facts, [205], where both the asserted fact and the opposing party's response are set forth in one document. Plaintiff says many of defendants' facts are inadmissible hearsay. Where I include or exclude those facts in this opinion, I explain why. The parties dispute many facts, but the facts in many of those disputes aren't material. To the extent disputed facts are relevant, and the cited exhibits do not directly contradict Olsson's version of the facts, I include the facts in the light favorable to Olsson.

incomplete is not denying it, so those facts are admitted unless evidence directly contradicting them is in plaintiff's statement of additional facts.

Defendants support some assertions by citing to affidavits, interrogatory responses, or deposition testimony. Plaintiff says some of these statements are inadmissible hearsay. *See, e.g.*, [197] ¶¶ 27, 147. But at the summary-judgment stage, these documents are treated as live testimony. *Widmar*, 772 F.3d at 460. Still, some of the affidavits, interrogatories, and depositions contain hearsay. *See, e.g.,* [197] ¶ 147. When plaintiff objected to those statements, I disregard any inadmissible hearsay.

Indeed, defendants' statement of facts suffers from hearsay. Specifically, defendants cite to hearsay that would have been admissible as records of a regularly conducted activity or as recorded recollections had defendants included a qualified witness's statement authenticating the documents, as required by Federal Rules of Evidence 803(5) and 803(6)(D). *See* [197] ¶¶ 120 (citing [187-34], email from Victoria Ingram); 139 (citing [189-12], email from Ghouse Mohiuddin); 148 (citing [187-41], letter from administrator to plaintiff's lawyer). For the exhibits that are part of plaintiff's clinical chart (those Bates Stamped EMHC000075–005107, EMHC005109–005179, EMHC005232–005238), defendants submitted a qualified witness's statement only when they filed their reply brief—that is, only after filing their statement of facts. *See* [204] at 8–9, n.1.[2] The statement was filed late, but I

---

[2] Those exhibits are Exs. [189-1] (summary of plaintiff's medical problems and relapse prevention plan), [189-2] (clinical record facesheet and discharge summary from January 2008 discharge, including benefits application process documentation); [189-3] (same, from

4

consider it because defendants have shown that the exhibits could be admitted at trial. *See Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 840 (7th Cir. 2014); *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016).[3]

## III.   Background

Paul Olsson is a civil detainee at Elgin Mental Health Center, where he has lived since 2010 after being found unfit to stand trial on charges of predatory sexual assault of a child and aggravated criminal sexual abuse. [197] ¶¶ 1, 2. Olsson was first admitted to the center in 2007. [197] ¶ 4. Between then and 2010, he was discharged and admitted to the center three times. [197] ¶¶ 4–6. Throughout his time there, Olsson has lived in four different housing units. [197] ¶ 7. He was originally assigned to the F Unit, then transferred to the Hartman Unit in 2010. [197] ¶¶ 41, 61. In 2015, Olsson was transferred to the all-male M Unit. [197] ¶ 78. He was transferred back to Hartman Unit in 2017. [197] ¶ 62. (After this lawsuit was filed, he was transferred to a fourth unit, a fact not relevant here. [197] ¶ 62.) During his time at the center, Olsson has taken distance-learning classes, including paralegal classes. [205] ¶ 42.

---

June 2008 discharge), [189-4] (same, from October 2008 discharge); [189-5] (January 2015 social work notes), [189-6] (psychiatrist note/transfer note), [189-7] (August 2015 progress notes), [189-8] (psychiatrist note), [189-9] (May 2017 progress notes), [189-10] (property evidence report detailing items allegedly confiscated from plaintiff's room on July 20, 2017), and [189-11] (June 2013 progress report/social work note).

[3] The attorneys put time and effort into submitting lengthy briefs and voluminous exhibits. But they risked sacrificing their clients' arguments by failing to comply with Local Rule 56.1 and the Rules of Evidence (and, from the defendants, by submitting a Rule 902(11) declaration which could have been deemed waived because it was filed in reply). Because the clients should not be penalized for attorney error, I take a flexible approach to local-rule enforcement here.

### A. Olsson's Assistance with Another Resident's Legal Cases and Olsson's Housing Transfer

From 2010 to 2015, Olsson lived in Hartman Unit, where he was assigned a psychiatrist named Richard Malis. [197] ¶¶ 62, 63. Plaintiff didn't care for Dr. Malis, [197] ¶ 64, and from 2010 to January 2015, repeatedly asked center staff, including defendants Jeffrey Pharis (Acting Forensic Program Director or Forensic Program Director from 2012 to 2016, [197] ¶ 36) and Daniel Hardy (Medical Director until June 2017, [197] ¶ 24), to be assigned to a different psychiatrist. [205] ¶ 2. All of his requests were met with either no response or an "I'll get back to you." [205] ¶ 2. In 2011, plaintiff met with Pharis and Malis about a grievance and complaint he filed. [205] ¶ 3. In that meeting, plaintiff said that his treatment team's relationship with him was "adversarial in nature and [plaintiff] tries his best to keep things peaceful." [205] ¶ 4. In response, Malis asked plaintiff, "if he wants things to be peaceful, why doesn't he consider how many people against whom he has filed lawsuits." [205] ¶ 4. On more than one occasion, Malis tried to convince him to stop filing lawsuits and helping other residents file lawsuits. [205] ¶ 1.[4] In January 2015, plaintiff met with

---

[4] Defendants note that this assertion is only backed by plaintiff's own declaration. [205] ¶ 1. But Olsson had personal knowledge of his interactions with Malis. *See* Fed. R. Evid. 602. His declaration is itself evidence and does not require additional support. Fed. R. Civ. P. 56(c)(4); *see James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020) (quotations and citation omitted) (A party can use an affidavit to oppose a motion for summary judgment where "the affidavit (1) attests to facts of which the affiant has personal knowledge; (2) sets out facts that would be admissible in evidence; and (3) shows that the affiant or declarant is competent to testify on the matters stated.").

Defendants also say I should disregard plaintiff's assertion about Malis's threats because it conflicts with plaintiff's deposition testimony and his interrogatory responses. In his interrogatory responses, plaintiff was asked to list each action or failure to act that he thinks subjects Malis to liability. [205-2] at 32–33. He said nothing about Malis trying to convince

Hardy about plaintiff's request for a new psychiatrist. [197] ¶¶ 64–65 (citing [187-5] and [189-5]).[5] Hardy told him he could be assigned to a different psychiatrist only if he changed housing units. [197] ¶ 65.[6] Plaintiff said he wanted to remain on Hartman Unit but continued to refuse to work with Dr. Malis. [197] ¶ 66.[7] In April 2015, Dr. Ulsa Kartan replaced Malis as plaintiff's treating psychiatrist, [205] ¶ 5, but because

---

him to stop filing grievances and lawsuits and assisting other residents with legal issues. [205-2] at 32–33. Plaintiff said in his deposition that Malis "made inappropriate threats toward me." [187-5] at 86:23–24. Asked to expand on the threats Malis allegedly made against him, plaintiff said, "I believe he said that if I was going to be involved with [Dr. Mannix, plaintiff's outside psychiatrist] that there would be—there would be consequences." [187-5] at 87:6–15. These responses are not inconsistent with his later assertion that Malis tried to convince him to stop filing lawsuits and helping other residents, so I consider the declaration.

[5] This is according to plaintiff's own deposition testimony, [187-5] at 86:11–18, and a January 2015 social worker log, [189-5], both of which plaintiff says are inadmissible hearsay. His testimony is admissible as the statement of a party opponent. Fed. R. Evid. 801(d)(2)(A). The social work log is admissible as a record of a regularly conducted activity. Fed. R. Evid. 803(6); *see* [205-3] (declaration of records custodian).

[6] In support of these assertions, defendants cite to the entire social work log without giving a page number, [197] ¶¶ 64–65, a violation of Local Rule 56.1, so I'm left to guess which statement they're relying on. (Two pages in the exhibit are indecipherable. *See* [189-5] at 4–5.) I assume defendants rely on two entries. One, a January 9, 2015, entry which reads, "[Plaintiff] was willing to meet with Dr. Hardy to discuss his request for a new psychiatrist." [189-5] at 2. The other, a January 13, 2015, entry that reads, "[Plaintiff] said Dr. Hardy gave him a choice of getting a new doctor but leaving the unit, versus staying on this unit and remaining with Dr. Malis. He said he chose to remain on the Hartman unit and was offering other ideas to how to [sic] conduct the staffing." [189-5] at 2. Plaintiff objects to these statements as inadmissible hearsay. [197] ¶¶ 64–65. The log is admissible as the record of a regularly conducted activity. The first entry is admissible as a party-opponent statement. Hardy's statement is admissible because, in this context, it is not offered for the truth of the matter. Instead, it is offered to show what led plaintiff to say that he was choosing to remain on Hartman Unit.

[7] In support, defendants cite to the social worker log, [189-5], which is admissible for the reasons explained above. Defendants also cite to a psychiatrist's note from August 19, 2015, which states, in relevant part, "[Patient] has been refusing to meet [indecipherable] for a long time. The case was transferred at pt request to have female psychiatrist that he is willing to work with. Since pt has issues with authority…he refused to cooperate with Dr. Malis." [189-6] at 2. This is a statement made for medical treatment and describing Olsson's medical history, and therefore admissible under Federal Rule of Evidence 803(4).

Malis remained part of the Hartman treatment team, he continued to see Olsson daily. [197] ¶ 81.

While Olsson resided on Hartman Unit, three female residents accused him of inappropriate sexual behavior. [197] ¶ 67. Plaintiff admits that the women accused him of inappropriate sexual behavior, [197] ¶ 67, but says the accusations are false, [205] ¶ 6. Based on those allegations, Dr. Malis recommended that plaintiff be transferred to the all-male M Unit. [197] ¶ 68.

During his time on Hartman, Olsson also came to know another resident named Abby Grason. [197] ¶ 69. Between 2013 and 2015, he helped Grason prepare and submit grievances about her medical treatment at the center. [197] ¶ 70. Specifically, in February 2015, he began helping Grason with a medical-treatment lawsuit she wanted to file against defendants Pharis (the program director), Hardy (the medical director), Malis (one of plaintiff's psychiatrists), Wayne Beyer (Consumer Support Specialist, [197] ¶ 8), Debbie Giardina (social worker until May 1, 2017, [197] ¶ 21), Maureen Jung-Oliver (social worker, [197] ¶ 31), Jeffrey Pilario (Nurse Manager of the Hartman Unit, [197] ¶ 37), and Daniel Dyslin (Senior Deputy General Counsel for the Illinois Department of Human Services, [197] ¶ 15). [205] ¶ 7. In February or March 2015, Grason told defendant Beyer that Olsson was helping her draft the complaint for that suit. [205] ¶ 8. In June 2015, she told her

treatment team about her plans to file the suit. [205] ¶ 8. In July or August, she told her psychiatrist. [205] ¶ 8.[8]

In July 2015, in a meeting with defendants Pharis, Hardy, Pilario, Giardina, Jung-Oliver, and two others, plaintiff was told he would be transferred to M unit. [197] ¶¶ 73–74. Plaintiff asked why he was being transferred, but Hardy simply told him that it was a decision from "Springfield." [197] ¶ 75. Plaintiff was transferred in mid-August 2015. [197] ¶ 78. After the transfer, some center staff members told him he was moved because he gave Grason legal help. [197] ¶ 83. On the same day Olsson was transferred from Hartman Unit, Grason was also transferred from Hartman Unit. [197] ¶ 85.

In 2016, after the transfer, Grason asked Olsson to help her with a Social Security issue. [197] ¶ 86. Her application for Social Security benefits had been denied, and Olsson agreed to help her appeal the denial. [197] ¶¶ 87–89.[9] Olsson did not use the library for any legal research related to Grason's appeal. [197] ¶ 90.[10] Though Olsson and Grason were on different housing units at the time, they were

[8] Plaintiff's statement of additional facts says Grason told her psychiatrist in July, which defendants do not dispute. [205] ¶ 8. Defendants' statement of facts says plaintiff testified that Grason told her psychiatrist in August (which plaintiff does not dispute), and that plaintiff knew this because he overheard a conversation between them in the center's dining room. [197] ¶¶ 71, 72.

[9] Whether Olsson helped Grason with an application for redetermination of the initial denial or whether Grason had already filed an application for redetermination by the time she asked Olsson for help, [197] ¶¶ 87, 88; [205] ¶ 15, is immaterial.

[10] Plaintiff denies this assertion on the grounds that it is incomplete. [197] ¶ 90. He explains that he did not use the library because the "library did not have any relevant information to assist in his representation of [Grason]." [205] ¶ 10. This does not controvert defendants' assertion, which is admitted.

able to speak by using the units' phones. [197] ¶ 95. Grason told her social worker that she asked plaintiff to represent her and she wanted him to review her chart in preparation for the hearing. [205] ¶ 16. Plaintiff used his personal digital assistant to keep notes on Grason's case, [205] ¶ 17, as he had done for legal matters involving other patients, [205] ¶ 14. In 2017, plaintiff served as Grason's representative in her Social Security hearing (conducted by phone); Grason won the appeal. [197] ¶¶ 96, 97; [205] ¶ 11, 18.

Either the day of the hearing or the day after, approximately five center staff members told Olsson that the administration was "displeased" with him representing Grason. [197] ¶ 99. Plaintiff could not say who comprised the "administration." [197] ¶ 100. Plaintiff could only remember the identity of two of the five staff members—defendant Wayne Beyer and someone named Chris. [197] ¶ 99. Plaintiff testified that Beyer told him that he was "very adamantly against advocacy in any way, shape or form" (plaintiff's words). [197] ¶ 101.

## B. Confiscation of Olsson's Personal Digital Assistant

In 2016, plaintiff's father emailed defendant Pharis a link to the specifications of a personal digital assistant plaintiff had requested. [205] ¶ 12. Shortly after, Pharis approved the PDA, knowing that with an add-on microphone, it would have voice-recording capabilities. [205] ¶ 13. (Defendants do not allege that plaintiff requested or possessed an add-on microphone. [205] ¶ 13.) Plaintiff openly used the PDA to take notes on his own case and on legal matters for other patients. [205] ¶ 14. According

to plaintiff's clinical chart/disciplinary log, in May 2017, he was seen using his PDA to either text or email security. [197] ¶ 106 (citing [189-9]).[11]

Later that month, security personnel searched plaintiff's room and confiscated the PDA, [197] ¶ 104, without explanation, [205] ¶ 20.[12] The PDA was password-protected. [197] ¶ 107. Plaintiff said Grason's "confidential information" was on the PDA, and he could not reveal the password unless Grason provided permission or signed a release. [197] ¶ 107. The state administrative code, included in the center's informational booklet for patients, families, and significant others, prohibits patients from storing information directly related to other patients or staff in their computers or "related equipment." [197] ¶ 109. The informational booklet also says that computers or related equipment that are used inappropriately will be confiscated. [197] ¶ 110. In June 2017, plaintiff's father sent an email to defendant Victoria Ingram (Acting Forensic Treatment Program Director from January to July 2017, [205] ¶ 69), attaching a grievance memo by Olsson. *See* [205] ¶ 21 (citing [198-1] at 12). (The grievance memo is not included in plaintiff's exhibits.) Given Ingram's response two weeks later, I assume the grievance was about confiscating the PDA.

---

[11] The clinical chart is admissible as a record of a regularly conducted activity. Fed. R. Evid. 803(6).

[12] Defendants dispute that the PDA was confiscated without explanation and instead claim that it was confiscated because plaintiff used it to text or email. [205] ¶ 20. Defendants' point isn't responsive to plaintiff's assertion (which is that there was no *explanation*, not no *reason*).

Ingram said, "The PDA is considered contraband due to the properties of recording capability." [198-1] at 12.[13]

## C. Olsson's Role on the Consumer Council and Confiscation of Legal Complaints

In 2015, plaintiff began participating in the center's consumer council, [205] ¶ 22, a patient council "intended to empower patients to take personal responsibility toward their own recovery." [197] ¶ 111. People serving on the consumer council can be removed for "inability to meet the criteria for patient participation, conduct that is detrimental to the purpose of the Council, or other relevant clinical or behavioral considerations (such as those who earn multiple or serious Loss of Privileges[])."[14] [197] ¶ 112. The removal criteria come from a center policy issued in August 2017, [205] ¶ 23, which was after plaintiff was removed from the council, [205] ¶ 39, some of his electronics were confiscated, [205] ¶ 35, and defendant Brian Dawson (the

---

[13] The parties interpret this in different ways. Plaintiff says Ingram was saying that the PDA was confiscated because it was contraband. [205] ¶ 21. Defendants say the email only says that the PDA was contraband; it doesn't say that it was confiscated because it was contraband. [205] ¶ 21. Under a hyper-technical reading, defendants are correct. But if the grievance memo did not challenge the PDA confiscation, then Ingram's response would be a non-sequitur. At this stage, a reasonable inference is that the grievance memo challenged the PDA confiscation, and that Ingram's email meant, in effect, that the PDA was confiscated because it was contraband.

[14] The criteria for patient participation are as follows, [197] ¶ 113 (citing [187-32] at 3):

> [A]bility to participate in council meetings for 60 minutes, be alert, be assertive on patients' rights and concerns, yet work with FTP Admin in a professional and collaborative manner and be solution-focused; (2) members should be actively working on their own recovery and be prepared to serve as role models/peer supports; and (3) members must be respectful of the input of all Council members and be "team players" who represent the concerns and needs of all patients."

hospital administrator, [197] ¶ 14) ordered the removal of legal documents that plaintiff posted around the facility, [205] ¶ 30.[15]

Plaintiff was elected president of the council in November 2016 and reelected in May 2017. [205] ¶ 22. In a June 2017 council meeting, plaintiff distributed the complaints from two lawsuits he'd filed against center staff. [205] ¶ 25.[16] Plaintiff also distributed a cover letter.[17] He asked the council members to post copies of the complaints on bulletin boards in the residential units. [197] ¶ 115. After the meeting, defendant Beyer told plaintiff and another council member (who was a plaintiff in both suits), "If you know what's good for you, you would back off on promoting these complaints." [205] ¶ 29 (citing [198-1] at 24, Declaration of Sean Gunderson). Beyer also said that if Olsson and the other council member continued to file lawsuits, it

---

[15] Plaintiff says that any assertions based on the August 2017 policy are incomplete and irrelevant, [197] ¶ 111, because of when the policy was issued, [205] ¶ 23. I assume plaintiff's point is that he wasn't on notice about what behavior would lead to removal from the council, and that defendants implemented the policy as a post-hoc pretext for removing him. *See* [205] ¶ 24. But the date on which the policy was issued is not responsive to defendant's assertions in paragraphs 111 and 112, and so is admitted. How the timing of the policy affects the legal analysis is a separate issue that I ultimately do not need to address because plaintiff offers no evidence that any of the defendants had the authority or made the decision to remove him from the council. (Plaintiff only says that Beyer told him he'd been removed. [205] ¶ 39.)

[16] Those suits were *Nadzhafaliyev v. Hardy*, 17-cv-4469 (N.D. Ill. June 13, 2017) (alleging that the center's disciplinary policies violated due process, *Nadzhafaliyev*, 403 F.Supp.3d 663, 664 (N.D. Ill. 2019)) and this suit. Olsson filed this suit in April 2017, [1], but filed an amended complaint in March 2019, where he added retaliation claims related to filing the initial complaint. [82].

[17] Plaintiff says that the cover letter explained why the lawsuits were relevant to center patients and how a patient could join the class of either suit. [205] ¶ 27. But, as defendants note, this inaccurately characterizes the letter. The letter does not mention the suits or joining a class. *See* [198-1] at 78–79. It instead says that many center residents were not informed that they were entitled to a jury determination on whether they met the criteria for involuntary commitment. It explains that if residents didn't waive that right knowingly and intelligently, they are entitled to have a jury reexamine their confinement. [198-1] at 78–79.

would not be beneficial for them. [205] ¶ 29. Beyer asked Olsson and the other council member if they were trying to "stoke a riot." [205] ¶ 29.[18] None of the named defendants ever communicated to plaintiff that they were upset with him for filing the lawsuits or for distributing copies of the complaints among other residents. [197] ¶ 119 (citing [187-6] at 162:22–24, 163:1–5).

In interrogatory responses, Dawson testified that he ordered the removal of the "legal documents posted by plaintiff around the EMHC facility" because they contained unspecified "personal and legal information of other residents." [205] ¶ 30.[19] Around July 21, 2017, Beyer told plaintiff that he had been placed on unit restriction and removed as president of the Consumer Council because he had violated the center's electronics policy. [205] ¶ 39.

---

[18] Defendants deny that Beyer said these things but cite to nothing in support of that denial. [205] ¶ 29. Instead, defendants say the assertions are immaterial for three reasons. [204] at 15–16. First, Olsson admitted that he doesn't know whether any of the complaints were actually posted. [204] at 15–16. Second, Olsson admits that he doesn't know whether any of the complaints were actually removed. [204] at 16. And third, Dawson gave the instruction to remove the complaints (not Beyer), and there is no evidence that Dawson expressed animus toward plaintiff. [204] at 16. But Dawson himself stated in interrogatory responses that legal documents were posted around the facility, [205] ¶ 30, and evidence of Beyer's intent is relevant to the claims against him.

[19] An email from Ingram instructing staff to confiscate the complaint says, "Mr. Dawson has issues with confidentiality/HIPAA." [187-34]. The email is hearsay if offered by defendants for the truth of the assertion that Dawson had "confidentiality/HIPAA" concerns, and I do not consider it as evidence of Dawson's concerns. Dawson's interrogatory answer—that he was concerned because the complaints contained personal and legal information of other residents—is admissible, however.

14

### D. Confiscating Olsson's Other Electronics

On July 13, 2017, staff searched plaintiff's room as part of a semi-annual inventory search. [205] ¶ 34.[20] During the search, staff found a computer tower and monitor, an inoperable computer tower, two flash drives, an external hard drive, an X-Box game console with two controllers, a battery-operated radio clock, an iPod, a Walkman radio, and a portable DVD player. [205] ¶ 34. Staff didn't confiscate any items. [205] ¶ 34. On July 20, staff searched plaintiff's room again. [205] ¶ 35; [197] ¶ 123; [187-36] at 4.[21] That search took place an hour after plaintiff returned from a meeting with an outside legal advocacy group.[22] The meeting was about the lawsuits plaintiff filed against center staff. [205] ¶ 35.

---

[20] Defendants say no semi-annual inventory search took place that day and note that plaintiff's only evidence is his own declaration, [205] ¶ 34, which defendants' security communications logs contradict, [205-1]. As I explain above, it's not inherently a problem that plaintiff's only evidence is his own declaration. Assuming, though, that defendants are challenging the statement because they think plaintiff has no personal knowledge of whether the search was a semi-annual inventory search, I disagree. It is reasonable to think that a resident of 7+ years would know when these inventory searches happened or would be able to identify one when he saw it.

[21] Defendants claim this was a facility-wide sweep. [197] ¶¶ 122–23. Plaintiff denies this because he didn't see other residents' rooms searched. [205] ¶ 35. Defendants respond that whether plaintiff saw other rooms being searched "is not determinative of" whether staff searched other rooms. [205] ¶ 35. That is true, but plaintiff's observation is still admissible, and the fact that plaintiff didn't see other rooms searched makes it more likely that other rooms weren't searched and that there was not a facility-wide sweep. The security department report recounting the search and confiscation of various items is admissible under the public-records exception. Fed. R. Evid. 803(8).

[22] Defendants "note that no evidence of this meeting [with the legal advocacy group] has been offered," but don't explicitly dispute that the meeting took place. [205] ¶ 35. Regardless, plaintiff has offered evidence by citing his own declaration. [205] ¶ 35 (citing [200] ¶ 20). Plaintiff says in his statement of facts that staff were already searching his room when he got back from the meeting. [205] ¶ 35. But as defendants note, this contradicts plaintiff's testimony, in which he says that staff arrived an hour after the meeting. [187-6] at 181:1–6. I rely on plaintiff's testimony instead of his statement of additional facts.

15

At the time of the search, Olsson had three corded electronic devices: the two personal computers and an X-Box game console. [205] ¶ 36. Olsson also had the following non-corded devices: an external hard drive, a Coby music player, four flash drives, an iPod Nano, a USB card reader, two Sandisks, and a Sandisk adapter. [197] ¶ 123 (citing [189-10], EMHC Property/Evidence Report, dated July 20, 2017).

When defendant William Epperson, chief of security, and another staff member reviewed the items confiscated from Olsson's room, they found a flash drive and Wi-Fi hot spot USB tucked into the bottom of the computer. [197] ¶ 126 (citing [187-10] at 14:13–20, 38:9–25 (Epperson deposition)); [187-36] at 3 (security department report with pictures of confiscated items).[23] Epperson testified that he saw images of young boys in their underwear on plaintiff's computer. [187-10] at 37:2–3. He said he tried to review the contents of the flash drive hidden in the computer but could not open it. [205] ¶ 40. The incident was referred to the Illinois State Police, [197] ¶ 127,[24] and the State Police reported discovering anime child pornography in the items. [187-10] at 37:5–9. Plaintiff says that he did not place the Wi-Fi hotspot on his computer and did not know it was there. [205] ¶ 41. He also says he did not possess anime child pornography on the confiscated computers. [205] ¶ 41.

---

[23] Epperson's testimony is not hearsay. [187-10] at 38:14–25. He is describing something he personally observed, not something someone said. The security department report, [187-36] at 3, is also admissible under the public-records exception because it sets out a "matter observed [by a public official] while under a legal duty to report." Fed. R. Evid. 803(8).

[24] Plaintiff denies this because it "fails to accurately represent the record." [197] ¶ 127. He then cites to an assertion in his statement of additional facts that does not dispute defendants' assertion that the matter was referred to the state police. I disregard plaintiff's denial.

16

(He was not charged with possession of child pornography. [205] ¶ 41; *see also* *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 250–51 (2002).)

Patients are not allowed to have computers with built-in wireless systems or external wireless internet cards, as explained in the Patient/Family/Significant Other Information Booklet that was given to plaintiff when he was admitted to the center. [197] ¶ 128. Patients know that these items are contraband because a copy of the center's contraband policy is posted in every room. [197] ¶ 130. On July 21, Beyer told plaintiff in a phone call that he had been placed on unit restriction and removed as president of the Consumer Council. [197] ¶ 132; [205] ¶ 39. This was three months after plaintiff's April 2017 lawsuit and one month after his June 2017 lawsuit. [197] ¶ 133.

### E.   Removing Olsson from the Distance-Learning Program and Prohibiting His Computer Use

Center residents can enroll in classes at outside educational institutions. [197] ¶ 134. If those classes require computer use, patients can use center computers for coursework. [197] ¶ 134. Distance-learning participants meet in the computer lab. [205] ¶ 42. Plaintiff first enrolled in the program in May 2012. [197] ¶ 136. He was removed from the program in 2013 because he used his personal computer to access the internet and "download sexually inappropriate materials and/or hide such files from the treatment team." [197] ¶ 137 (citing [189-11]).[25] Plaintiff was allowed to rejoin the program in April 2016. [197] ¶ 139.

---

[25] Plaintiff denies this on inadmissible-hearsay grounds, but doesn't deny it for any other reason (e.g., that it isn't true). The assertion comes from the monthly social work notes that

When a resident joins the distance-learning program, an instructor reviews the rules and policies of the program with the resident, who then must sign a form promising that he will only use the distance-learning computers for educational purposes. [197] ¶ 140. When he re-enrolled, Olsson signed an Internet Access Certificate of Understanding. [197] ¶ 141. The certificate says that the signer "accept[s] that any violation of the Internet usage policy may result in financial liability on my part and/or disciplinary action" and acknowledges that the center's information management office is "authorized to monitor all Internet access, searches, downloads, sites visited, etc. and the user [] is held responsible for any nonbusiness/inappropriate Internet activities." [197] ¶ 141. If a resident violates the rules and regulation laid out in that form, he is terminated from the program. [197] ¶ 142.

In 2017, plaintiff took a class in paralegal studies. [205] ¶ 42.[26] Distance-learning coordinator Helen Johnson often asked plaintiff to help other residents with their computer assignments. [205] ¶ 43. Sometimes, when the computers had technical problems, Johnson asked plaintiff to help address the problem. [205] ¶ 43. On several occasions and with Johnson's approval, plaintiff accessed the DOS command to resolve technical problems for fellow residents. [205] ¶ 44. Plaintiff never

are admissible as records of a regularly conducted activity. [189-11] at 2; Fed. R. Evid. 803(6)(b)(4). But the section of the notes that says Dr. Michael Bednarz recommended plaintiff use a public computer for distance learning, instead of a private one, is inadmissible hearsay. [189-11].

[26] Defendants dispute this assertion because, they say, it contradicts plaintiff's testimony that he took paralegal classes in 2010. [205] ¶ 42. This is not responsive—plaintiff could have taken paralegal classes in 2010 and 2017—and so is admitted.

entered the DOS command without Johnson requesting that he do so. [205] ¶ 44.[27]
Another resident in the distance-learning program said in a declaration that Johnson
also asked him to access the DOS program. [205] ¶ 45. Under the Illinois
administrative code, "if an individual [in a state mental health facility] is approved
to use a computer, software that is approved includes the following: A) Operating
system (i.e., DOS, Windows, OS2." [205] ¶ 52.[28] Epperson testified that he believed
that a patient who accesses DOS can "mess with [the center's] server," but that he is
not an information services officer and wasn't certain that his belief was accurate.
[205] ¶ 46 (citing [187-10] at 81:16–22).

According to a security department report signed by Epperson and dated
September 13, 2017, distance-learning coordinator Heather Johnson saw Olsson pull
up a DOS program and asked him to close the window immediately. [187-36] at 2.
(According to the report, this happened on September 6, 2017. [187-36] at 2. But
plaintiff says in his statement of additional facts that it happened September 13, and
defendants don't dispute the date. [205] ¶ 47.) The next day (September 7, according

---

[27] Defendants dispute the statement because, they say, they "submitted evidence that using
an EMHC computer to access a DOS program window is grounds for termination" from the
distance-learning program. [205] ¶ 44. Defendants do not cite to that evidence. Regardless,
it is not responsive to plaintiff's claim that Johnson gave him permission to access a DOS.
Nor is defendants' assertion that Johnson told her supervisor of the incident. [205] ¶ 44. It is
possible that Johnson gave plaintiff permission to use DOS, even though using DOS was not
allowed, and then reported his DOS use to her supervisor.

[28] The parties disagree about what this language means. Plaintiff says it means that
individuals allowed to use computers are allowed to access the DOS program. [205] ¶ 52.
Defendants say that the language doesn't indicate "that [center] residents who are permitted
to use computers may *access* or alter the computer operating system." [205] ¶ 52. For present
purposes, the scope of the code's authorization to use or access DOS is immaterial.

to the report), Johnson completed a security report and reported the incident to her supervisor. [187-36] at 2.[29]

On September 13, 2017, plaintiff was in the computer lab working on an assignment when defendants Epperson and staff member Comissa Hamilton entered the lab and told Olsson his distance-learning privileges were suspended. [205] ¶ 47. Epperson said that a written explanation would be provided, but it never was. [205] ¶ 47.

According to defendant Ingram, who was not involved in the decision to remove plaintiff from the program, plaintiff was removed because he used the class time and internet access provided through the program to "access websites and materials" he wasn't allowed to access. [197] ¶ 27 (citing [187-15] ¶ 3).[30] Plaintiff was later banned

---

[29] Plaintiff objects to the report as inadmissible hearsay. [197] ¶¶ 143–44. The report itself is admissible under the public-records exception. Fed. R. Evid. 803(8). It sets out a "matter observed [by a public official] while under a legal duty to report." It doesn't matter that Epperson himself didn't observe plaintiff access DOS, and instead relied on Johnson's statements. "Rule 803(8) is a multi-level exception" because "the bureaucrat who fills out a governmental form usually incorporates information furnished by others." *Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1308 (7th Cir. 1992).

[30] This is not hearsay, contrary to plaintiff's argument, [197] ¶ 27, because Ingram did not introduce any out-of-court statement. She simply said she was aware of a fact but doesn't explain how she came to know it. [187-15] ¶ 3.

from using any state computer. [197] ¶ 147.[31] The Illinois Department of Human Services also discontinued plaintiff's internet access.[197] ¶ 148.[32]

On the same day that plaintiff's distance-learning privileges were suspended, Epperson contacted the information management office, asking them to review the computer plaintiff was using. [205] ¶ 48. Shortly before the center suspended plaintiff's distance-learning privileges, internet access, and computer use, plaintiff had filed three grievances: two on September 1 and one on September 5. [205] ¶ 49. In the first grievance, plaintiff asked why the center had not completed its review of the electronic items confiscated six weeks earlier. [205] ¶ 50. In the second, he alleged that the center was violating a policy that requires it to respond to grievances within five days. [205] ¶ 50. Defendant Ingram returned both grievances as "unable to resolve because of 'Administrative decision.'" [205] ¶ 50. In the third grievance, plaintiff complained that his father was barred from bringing legal documents to him during their visits. [205] ¶ 51. The grievance was marked "unable to resolve" and

---

[31] Defendants attribute this ban to "computer use infractions." [197] ¶ 147. In support they cite the testimony of defendant Thomas Zubik, Director of the Forensic Treatment Program since April 2018. [197] ¶ 40. Zubik testified that he told center librarian David Hagerman, per a message from Dawson, that Olsson was no longer allowed to use state computers "because of infractions." [187-22] at 55:14–25. Zubik's statement to Hagerman and any statement by Dawson nested within Zubik's testimony is inadmissible hearsay when offered to establish the reason.

[32] Defendants say DHS discontinued plaintiff's internet access "after a serious violation of the Internet Access Certificate of Understanding." [197] ¶ 148. In support, they cite to an exhibit they have not attached (Exhibit AA to Zubik Dep.) and a letter from a non-defendant administrator to plaintiff's lawyer. [187-41] at 2. Defendants don't cite to an affidavit, interrogatory response, or testimony from the administrator that could make the letter admissible.

forwarded to Ingram and Epperson, but plaintiff never received a response. [205] ¶ 51.

### F.    Olsson's Access to Legal Resources

At all times relevant to this suit, the center's library offered two legal resources to residents: the Illinois Compiled Statutes (2016 edition) and Volumes 1 and 2 of the supplements to the 2016 edition of the Illinois Compiled Statutes. [197] ¶ 173. (Two desktop computers with access to Thompson Reuters Westlaw Correctional were added after March 2020. [197] ¶ 173; [187-43] at 55:20–25, 56:1–25.[33] Because of COVID-19, residents were restricted to their units and unable to use the library's computers until June 2021. [205] ¶ 57.)

The center's librarian, defendant Hagerman, has no legal training, nor has he received training on Thompson Reuters Westlaw Correctional. [205] ¶ 59. Defendant Hagerman can look up "a specific case or a specific law" for a resident, [205] ¶ 60 (quoting [187-43] at 57:7–25, 58:1–7), but he "does not conduct legal research such as that performed by a paralegal." [205] ¶ 60 (citing [187-43] at 61:19–23). If a resident asks Hagerman to conduct legal research that Hagerman thinks should be conducted by an attorney, Hagerman will reject the request and tell the resident to speak to an attorney. [205] ¶ 61. When plaintiff asked Hagerman to print out an *in forma pauperis* petition, Hagerman refused and told plaintiff to go through his attorney. [205] ¶ 62. Olsson alleges that Hagerman was ordered to deny his requests to print

---

[33] The parties say the computers have access to Westlaw Correctional. [197] ¶ 173; [205] ¶ 59. But in his deposition, Hagerman said the computers have access to LexisNexis. [187-43] at 31:13–18, 38:14–25, 39:1–15. I use the parties' representation in their statements of fact.

out legal materials, so the only way for Olsson to access legal materials was to ask his father to put cases on a CD and send them to Olsson. [197] ¶ 171. Olsson says that as a result, he has been unable to bring lawsuits on his own behalf and help other center residents bring lawsuits. [197] ¶ 172. Olsson never asked Hagerman to look up any case law or statutes and print them out. [197] ¶ 175.

## IV. Analysis

Plaintiff dropped his claims against defendants Coleman, Freeman, Dyslin, Corcoran, Giardina, Jackson, Jung-Oliver, and Pilario midway through summary-judgment briefing. [196] at n.2. The remaining defendants are Beyer, Dawson, Epperson, Hagerman, Hardy, Ingram, Malis, Pharis, and Zubik. Plaintiff brings First Amendment retaliation claims against all those defendants but brings denial-of-access-to-courts claims against only four of them: Hagerman, Pharis, Ingram, and Zubik.

### A. Denial of Access to Courts

Pretrial detainees, like prisoners, have a fundamental right of access to the courts. *Lehn v. Holmes*, 364 F.3d 862, 865 (7th Cir. 2004). The right is limited, though. It assures only meaningful access to the courts, *id.* at 866, and any access claim must be tied to vindication of a "separate and distinct right." *Id.* (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). A plaintiff must demonstrate that "prison officials failed to assist in the preparation and filing of meaningful legal papers," and that, as a result, he suffered an actual injury—he was hindered in his efforts to file a complaint or to pursue a claim once in court. *See id.* at 868; *Marshall v. Knight*, 445 F.3d 965, 969 (7th Cir. 2006).

The right doesn't require a facility to offer any specific resources. *Lehn*, 364 F.3d at 868. Law libraries, for instance, "are not ends in themselves." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). They are just "one constitutionally acceptable method to assure meaningful access to the courts." *Id.* Prisons (and civil detention facilities) can provide meaningful access in other ways. *See id.* But some alternatives are clearly inadequate. For instance, a library with no state statutes, digest, or reporters, where inmates cannot have materials copied unless they provide the exact citation to a case or statute, does not provide meaningful access. *See Corgain v. Miller*, 708 F.2d 1241, 1248–50 (7th Cir. 1983). Meaningful access avoids putting detainees in a Catch-22, where the detainee can obtain legal materials only by giving the librarian precise citations, but can only obtain precise citations by referring to legal materials. *Id.* at 1250.

An access-to-courts claim requires plaintiffs to explain specifically how inadequate resources hindered their efforts to pursue a claim, *Lewis*, 518 U.S. at 351, or "caused a potentially meritorious claim to fail." *Marshall*, 445 F.3d at 969. A plaintiff might show, for instance, that inadequate resources hindered him so much that he wasn't even able to file a complaint. *Lewis*, 518 U.S. at 351. Or he might show that his complaint was dismissed because he failed to comply with a technical requirement that, without access to adequate resources, he could not have known about. *Id.*

Olsson says that Hagerman (the center's librarian), Pharis, Ingram, and Zubik (Forensic Program Directors and Acting Forensic Program Directors at various times)

24

denied him adequate access to the courts. [196] at 21. Specifically, he says Hagerman "determine[d] when he [Hagerman] provide[d] legal research and who he provide[d] it for." [196] at 21. Plaintiff also points to Hagerman's refusal to print out an *in forma pauperis* form for plaintiff. [196] at 24. The directors, meanwhile, "were responsible for EMHC's resources, including the library." [196] at 21. To succeed on his claims, Olsson must show that the resources and legal-research assistance were constitutionally inadequate, and that he suffered an injury as a result. In addition, to impose liability under § 1983, plaintiff must demonstrate each defendant's personal involvement in the constitutional violation. *See Taylor v. Ways*, 999 F.3d 478, 493–94 (7th Cir. 2021); *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

When Olsson filed this suit in 2017, the center's library offered only the Illinois Compiled Statutes (2016 edition) and volumes 1 and 2 of the supplements to the Compiled Statutes. [197] ¶ 173. The library did not install computers with access to Westlaw Correctional until the COVID-19 outbreak (the parties do not point to evidence of when, exactly, they were installed). [196] at 20; [187-43] at 55:20–25–56:1–25. The librarian, defendant David Hagerman, can find a case or statute for a resident if they give him a name or citation, [205] ¶ 60 (citing [187-43] at 57:7–25, 58:1–7), but he does not conduct the sort of legal research a paralegal would. [205] ¶ 60 (citing [187-43] at 61:19–24).[34]

---

[34] Asked to clarify what he meant by this, Hagerman said he could look up the elements of a burglary because "[t]hat's just a definition," but he could not do the sort of research where he "sit[s] down for hours." [187-43] at 58:8–18, 60:24–25–61:1–2. He added that "[i]f a patient

25

This could be the sort of Catch-22 scenario that does not provide meaningful access to the courts. *See Corgain*, 708 F.2d at 1250. Center residents had access to statute citations but no access to case reporters. They could only access cases by giving Hagerman case citations, but could only give Hagerman case citations by accessing cases. In theory, they could have provided Hagerman with citations to statutes and asked him to find cases interpreting those statutes. But Hagerman said he didn't do that sort of research. [187-43] at 61:5–9. What's more, the center didn't provide any federal statutes or cases; residents were left to rely entirely on state law.

Olsson says that, because of these inadequate resources, multiple complaints he filed were dismissed for failure to comply with procedural technicalities.[35] But he does not explain what those procedural technicalities were. And with one exception, he does not explain specifically how the inadequate legal resources hindered his ability to pursue legal claims. A plaintiff must do more to defeat a motion for summary judgment. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021). The one specific example Olsson offers is the *Jung-Oliver* suit, 18-cv-07084 (N.D. Ill. 2018), where plaintiff challenged his conditions of confinement on due-process grounds. [196] at 25; [205] ¶¶ 64, 65. After Olsson filed the complaint in

---

came up to me and said could you go on the internet and find all cases or as many cases as you can dealing with child endangerment or custody issues, I'm not going to do that. I'm not that type of researcher." [187-43] at 61:5–9.

[35] Those complaints are *Olsson v. Weatherspoon*, No. 07-cv-06035 (N.D. Ill. 2007); *Olsson v. Almazar*, No. 07-cv-06436 (N.D. Ill. 2007); *Olsson v. O'Malley*, No. 08-cv-06317 (N.D. Ill. 2008); *Olsson v. Madigan*, 12-cv-03057 (N.D. Ill. 2012); *Nadzhafaliyev v. Hardy*, 17-cv-04469 (N.D. Ill. 2017); *Olsson v. Malis*, 18-cv-06838 (N.D. Ill. 2018); *Olsson v. Jung-Oliver*, 18-cv-07084 (N.D. Ill. 2018). [205] ¶ 63.

*Jung-Oliver*, he started to question whether he should have filed an Eighth Amendment cruel-and-unusual-punishment claim instead. [196] at 25; [205] ¶ 65. Plaintiff says he did not have adequate resources to answer this question.[36] Afraid that his case would not survive the screening process and would be dismissed for failure to state a claim, he voluntarily dismissed the case. [196] at 25; [205] ¶ 65. Plaintiff wanted to refile, but he says he was unable to research the issue. [196] at 25; [205] ¶ 66. Two years later, though, Olsson filed another case, *Olsson v. Zubik*, 20-cv-01701 (N.D. Ill. 2020), which brings claims substantially similar to those in *Jung-Oliver*.

The *Jung-Oliver* complaint alleged that defendants' failure to properly care for another resident (who urinated throughout the facility and ate his own feces) "created a highly unsanitary environment where plaintiff [was] in great and iminent [sic] danger of contracting a virus or bacteria." 18-cv-07084, [1] at 6. The complaint also alleged that the Hartman Unit was chronically infested with mice and cockroaches. 18-cv-07084, [1] at 7. Similarly, the *Zubik* complaint alleges that Hartman Unit suffers from a rodent and insect infestation problem, insects and foreign objects are commonly found in food, juice is served in a moldy punch bowl, meat is dangerously undercooked, the air vents are covered in black mold, and more. 20-cv-01701, [1] ¶¶ 2, 18, 21–23, 26–27, 39–40. Given that Olsson was able to pursue the *Zubik* lawsuit (and

---

[36] Defendants contest this, [205] ¶ 65, but plaintiff has at least raised a material dispute over whether, without access to federal law and without a librarian able to do legal research, he could have answered this question.

is still pursuing it), he did not suffer a cognizable access-to-courts injury when he was unable to refile the *Jung-Oliver* lawsuit.

Defendants' motion for summary judgment on Olsson's access-to-courts claim is granted.

### B. Retaliation

#### 1. *Legal Standards*

To prove retaliation, a plaintiff must demonstrate that 1) the plaintiff was engaging in protected First Amendment activity, 2) the plaintiff suffered a deprivation that would likely deter a reasonable person from future First Amendment activity, and 3) the First Amendment activity was a "motivating factor" in the defendant's decision to act against the plaintiff. *See Jones v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). Defendants only argue on the motivating-factor element. A "motivating factor" need not be the sole factor, *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008), but it must be a sufficient factor. *Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013). Retaliation can still be a motivating factor even when the retaliatory act, when taken for non-retaliatory reasons, would have been proper. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (citing *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987)).

A defendant may offer a legitimate, non-retaliatory reason for taking the action. *See Vukadinovich v. Bd. of Sch. Trustees of North Newton Sch.*, 278 F.3d 693, 699 (7th Cir. 2002). In that scenario, a defendant can even acknowledge that retaliation was a motivating factor, so long as they demonstrate that it was not a "necessary condition of the harm." *Walker v. Groot*, 867 F.3d 799, 803 (7th Cir. 2017).

That is, absent defendants' retaliatory motive, "the harm would have occurred anyway." *Id.*

In response to a defendant's sufficient proof of non-retaliatory causation, the plaintiff can still prevail by showing that the defendant's proffered reason is pretextual. *Vukadinovich*, 278 F.3d at 699. The plaintiff can demonstrate pretext directly (by, for instance, a defendant's comment that she took adverse action against the plaintiff because of his First Amendment activity, *see Massey v. Johnson*, 457 F.3d 711, 718 (7th Cir. 2006)) or indirectly. *Vukadinovich*, 278 F.3d at 700. To demonstrate pretext indirectly, the plaintiff can show that the defendant's justification is not supported by facts, is not the real reason for the action, or is insufficient to warrant the action. *Id.* "In the summary judgment context, this means that [plaintiff] has to show that a rational finder of fact could infer that the defendants' stated reasons for [acting against] him were lies." *Id.* at 699.

2. *Application to Defendants*

a. Dawson

Dawson was the center's hospital administrator. [197] ¶ 14. Plaintiff says Dawson retaliated against him for filing lawsuits and helping other detainees file lawsuits. [196] at 26. Specifically, he says Dawson ordered others to remove plaintiff's legal complaints[37] and ordered the confiscation of his non-PDA electronic devices to

---

[37] Defendants misunderstand plaintiff's argument about the significance of removing the legal complaints. [186] at 31–32. Plaintiff does not argue that posting legal complaints on facility bulletin boards is protected First Amendment activity. [196] at 34–35. So defendants' discussion of whether that right is protected (a discussion that seems to conflate posting legal complaints with serving as a jail house lawyer, [186] at 31–32) is beside the point. Plaintiff

retaliate against him for his legal work. [196] at 34–37. Plaintiff has offered sufficient circumstantial evidence that Dawson was motivated in part by retaliation. For one, Dawson ordered the complaints removed the same month that plaintiff filed a lawsuit against the center (and two months after he filed another lawsuit). [205] ¶¶ 25; [197] ¶¶ 115, 120. A month later, immediately after plaintiff met with a legal advocacy group, staff searched his room and confiscated electronic devices. [205] ¶ 35.

Suspicious timing by itself will rarely establish the motivating-factor element of a retaliation claim. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). But it can when the allegedly retaliatory action "follows close on the heels of protected expression," and the person who decided to act against the plaintiff knew that the plaintiff was engaged in protected conduct. *Id.* (quoting *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001)).[38] Dawson knew about the lawsuits filed in April and June. He was a defendant in both, [205] ¶¶ 19, 25, and he ordered the complaints taken down because he believed they contained "personal and legal information of other residents" (indicating he was familiar with them). [205] ¶ 30. He also knew that Olsson was meeting with a legal advocacy group the day of the second search. [187-5]

is simply arguing that he was exercising his First Amendment rights by filing suits and helping others file suits. [196] at 26. Removing legal complaints is, in his view, the adverse act likely to chill future exercise of those rights. [196] at 34–35. In their motion for summary judgment on the retaliation claim, defendants only argue that plaintiff cannot prove retaliatory motive; defendants do not challenge (for purposes of this motion) plaintiff's theory of adverse actions.

[38] Plaintiff also alleges that Dawson retaliated against plaintiff for representing Abby Grason in her Social Security proceedings. *See* [187-5] at 109:1–25; 110:1–10. But Dawson began his allegedly retaliatory behavior in June 2017, when he ordered complaints removed. [197] ¶¶ 115, 120. That was four months after plaintiff represented Grason in her hearing, [205] ¶ 11, and therefore not close on the heels of protected activity.

at 110:4–10; [187-6] at 182:6–21. Given how close in time Olsson's legal activities were to Dawson ordering plaintiff's complaints removed and his electronics confiscated, plaintiff has pointed to enough evidence to suggest an improper motivating factor.

Dawson says that he ordered the complaints removed because he worried about the personal and legal information of other residents "who, to [d]efendant's knowledge, had not given permission for their information to be publicly posted within EMHC." [187-44] at 3; *see* [205] ¶ 30. If Dawson's concerns were based on a genuine, albeit mistaken, belief about what the other residents consented to, then he did not harbor a retaliatory motive. *See Redd v. Nolan*, 663 F.3d 287, 295 (7th Cir. 2011). Plaintiff says that the residents named in the complaints signed onto them as plaintiffs, "indicating their consent to them and the information contained." [196] at 35. But this doesn't say anything about whether they'd consented to have the complaints posted within the facility, let alone whether Dawson genuinely believed that they hadn't consented. Plaintiff therefore hasn't raised a material dispute to defeat summary judgment in favor of Dawson for the removal of plaintiff's complaints.[39]

Defendants provide the following explanations for the search of Olsson's room and seizure of his electronics. Staff searched plaintiff's room during a facility-wide

---

[39] Similarly, although I sustained plaintiff's hearsay objection to Ingram's report that Dawson's concern was one of "confidentiality/HIPAA," *see* note 19 above, the email does not raise a genuine dispute over pretext, when relied on by plaintiff. Plaintiff says that a review of the complaints reveals no HIPAA disclosure. [196] at 15. But at most this is evidence of Dawson's mistaken understanding of confidentiality and HIPAA; it is not enough for a jury to conclude that Dawson was lying about his concerns.

sweep after administrators learned that a staff member and resident had an inappropriate relationship. [197] ¶¶ 122–23; [187-10] at 36:21–23, 37:19–21, 40:2–19. Staff took his electronics because he had more devices than center policy allowed. [197] ¶¶ 122, 124. And staff kept his electronics because they discovered a flash drive and Wi-Fi hot spot hidden in his computer, [197] ¶¶ 125–26, in violation of center policy forbidding residents from accessing the internet while in their residence units. [197] ¶¶ 128–29.

Plaintiff responds that there was no facility-wide sweep; he saw staff search only his room. [197] ¶¶ 122; [205] ¶ 35. He also says he wasn't violating the center's electronics policy because the written policy does not say what constitutes an electronic device and defendant Pharis previously said that "the limit on electronics stands at 3 plug-in items." [205] ¶ 33. He had only three plug-in items (two personal computers and an X-Box game console) when his electronics were confiscated. [205] ¶ 36. What's more, when staff searched plaintiff's room a week earlier, they found the same items and did not confiscate them. [205] ¶ 35. All of these points undermine defendants' proffered reasons for searching his room and then confiscating his electronics. As for staff holding on to his items after confiscating them, plaintiff does not challenge staff keeping the WiFi hotspot. But defendants never explain why, in response to finding too many electronics and a hotspot, they kept all the electronics. [205] ¶ 50 (defendants still had plaintiff's electronics on Sep. 1, 2017). In fact, according to defendant Epperson's testimony, when staff confiscate a resident's electronics because the resident has more than three, the resident is allowed to choose

three of the confiscated items to keep. [187-10] at 76:8–16. And if it is true that plaintiff wasn't violating the electronics policy, then the center held onto plaintiff's items for 24 hours without proof of *any* policy violation; staff only discovered the WiFi hotspot the day after the search. [197] ¶ 126. This is enough to suggest pretext. I therefore deny summary judgment on the retaliation claim against Dawson related to seizing plaintiff's electronics.

### b. Epperson

Epperson served as Chief of Security, [197] ¶ 17, tasked with "security, custody and control of residents." [187-10] at 16:9–16. As part of that role, he took orders from Dawson about when to conduct searches. [187-10] at 41:15–25, 42:9–15. Epperson directed subordinates to search Olsson's room on July 20, [205] ¶ 37—the search where staff confiscated multiple electronic items, *see* [205] ¶¶ 35–36. He was also involved in confiscating plaintiff's PDA. [187-10] at 82:6–16.

Plaintiff alleges that Epperson retaliated against plaintiff by directing staff to confiscate his PDA and other electronic devices and revoking his distance-learning, computer-access, and internet-access privileges. To retaliate against Olsson, Epperson had to know that Olsson was engaged in protected First Amendment activity. Epperson knew about some things, but not everything. He knew that plaintiff was helping Grason in her Social Security appeal because he had to sign off on Grason and plaintiff using a room for their telephone conference with the ALJ. [187-5] at 110:4–10, 111:6–11. He knew that Olsson filed a lawsuit in mid-June because Epperson was one of the defendants. [205] ¶ 25. He also knew that plaintiff was meeting with a legal advocacy organization on July 20th because, again, he had

33

to approve "use of the attorney room." [187-6] at 182:6–21. There is no indication, however, that Epperson knew about the three grievances plaintiff filed in early September. So to the extent plaintiff is arguing that Epperson suspended plaintiff's distance-learning privileges because of those grievances, plaintiff's claim fails. However, I take plaintiff to allege that the suspension was motivated by more than just the grievances, but also by the lawsuits he filed, the help he gave Grason, and his meeting with a legal advocacy group.

The relevant timeline is as follows. In November 2016, Pharis approved plaintiff's use of the PDA, knowing that the PDA—if attached to a microphone, which defendants do not allege plaintiff requested—had recording capabilities. [205] ¶ 13. Plaintiff used the PDA to take notes on his own cases and on cases he was helping other patients with. [205] ¶ 14. From November 2016 to February 2017, Olsson helped Grason challenge the denial of her application for Social Security benefits. [205] ¶¶ 15, 18. In late February 2017, Olsson successfully represented Grason in her Social Security appeal hearing before an ALJ. [205] ¶ 18. In late April 2017, plaintiff filed this suit against multiple center staff members. [205] ¶ 19. On May 24, 2017, plaintiff's previously approved PDA was confiscated without explanation. [205] ¶ 20. In mid-June, plaintiff filed another lawsuit against staff facility. [205] ¶ 25. The second suit named Epperson as a defendant. [205] ¶ 25. On July 13, staff searched plaintiff's room and found multiple electronics. They didn't confiscate them. [205] ¶ 34. On July 20, plaintiff met with a legal advocacy group about his lawsuits. [205] ¶ 35. An hour later, staff again searched plaintiff's room, and this time confiscated

all his electronics. *See* [205] ¶ 35. On September 13, Epperson entered the distance-learning lab and told plaintiff his distance-learning privileges were suspended. [205] ¶ 47. Epperson said a written explanation would be provided, but it never was. [205] ¶ 47. Plaintiff was banned from using any state computer or accessing the internet. [197] ¶ 147; [196] at 37.

Olsson says that suspicious timing, combined with staff's "widespread and repeated expressions of disapproval" of Olsson's protected First Amendment activity, show that Epperson confiscated his PDA out of retaliation. [196] at 30. But plaintiff does not point to any admissible "expressions of disapproval" by Epperson. Retaliatory motive must be attributed to each specific defendant. A "retaliatory attitude existing generally among [staff]" is not sufficient. *Massey*, 457 F.3d at 718; *see Jones*, 27 F.4th at 1286–87. Still, Olsson has more than suspicious timing to rely on. He has the absence of a contemporaneous explanation (to him) for the seizure, and evidence that defendants' stated reason—that plaintiff was seen using the PDA to text and/or email staff in violation of center policy—isn't true. [205] ¶ 14. This is enough to raise a question of credibility for a jury.[40]

When it comes to revocation of distance-learning privileges, computer access, and internet access, though, Olsson only has suspicious timing. Again, there is no evidence that Epperson knew about the grievances Olsson filed shortly before

---

[40] Defendants imply that they would have confiscated the PDA anyway because plaintiff was using it to store Grason's confidential information related to her Social Security litigation. [186] at 30. But defendants offer no evidence that they knew Olsson was storing Grason's confidential information until after they confiscated the PDA. [197] ¶ 107.

Epperson revoked his privileges. So any retaliation would have to stem from Olsson helping Grason, Olsson filing suit against Epperson and others, or Olsson meeting with the legal advocacy group. Those took place seven, three, and two months before Epperson revoked plaintiff's privileges, respectively. By itself, that timing is not close enough to demonstrate a retaliatory motive. *See Kidwell*, 679 F.3d at 966.

Finally, Olsson alleges that Epperson, like Dawson, confiscated his other electronics out of retaliation. Olsson has made out a claim against Dawson for confiscating and keeping his electronics, as I explained above. Like Dawson, Epperson had the requisite knowledge to retaliate. He knew that plaintiff filed a lawsuit in June because he was named as a defendant, *Nadzhafaliyez v. Hardy*, 17-cv-04469, [1], and he knew that plaintiff was meeting with a legal advocacy group on the day of the second search because he would have had to sign off on using the room. *See* [187-5] at 111:10–11; [187-6] at 182:6–21.

The question here is whether a subordinate with retaliatory intent (Epperson) who follows orders from a superior with retaliatory intent (Dawson) has retaliated. Retaliatory intent is a motivating factor when the intent is sufficient and necessary to taking the adverse action. *See Peele*, 722 F.3d at 960. If defendant shows that he would have taken the adverse action even without retaliatory intent, then retaliation wasn't a motivating factor. *See id*. Applied here, would Epperson have ordered his subordinates to search plaintiff's room and confiscate plaintiff's electronics had Dawson not ordered him to? If so, Epperson would be liable for retaliation. If not, Epperson would not be liable. There is not enough information in the record on this

36

point, and as a result, Epperson has not shown that he is entitled to judgment as a matter of law.

### c. Beyer

Beyer served as the center's Consumer Support Specialist. [197] ¶ 8. As part of that role, Beyer attended Consumer Council meetings to ensure that discussions "remained productive and appropriate." [197] ¶ 9. At a June 22, 2017, council meeting, Olsson distributed the copies of complaints in the lawsuits he had filed, [205] ¶ 27, and asked council members to post the complaints to resident bulletin boards. [197] ¶ 115. At the end of that meeting, Beyer told plaintiff, "If you know what's good for you, you would back off on promoting these complaints." [205] ¶ 29. Beyer also told plaintiff and fellow resident Sean Gunderson that continuing to file lawsuits wouldn't be beneficial for them and asked if they were trying to "stoke a riot." [205] ¶ 29. Finally, around July 21, 2017, Beyer told plaintiff that he had been placed on unit restriction and removed as president of the Consumer Council because he had violated the center's electronics policy. [205] ¶ 39. No doubt, Beyer's earlier comments would demonstrate retaliatory motive if Beyer later acted against Olsson. But plaintiff offers no evidence that Beyer himself made the decision or even had the authority to place him on unit restriction or remove him as president. *See* [196] at 33. The evidence shows only that Beyer delivered the news. Without more, plaintiff cannot make out a claim against Beyer.

### d. Hagerman

David Hagerman is the center's librarian. [197] ¶ 23. He knew that Olsson had filed grievances and lawsuits against center staff, including him, and that Olsson

helped other residents with their complaints. [205] ¶ 71. Plaintiff does not say what retaliatory conduct Hagerman allegedly took. He mentions the fact that Hagerman refused to print out an *in forma pauperis* form for him, and instead referred him to an attorney, [205] ¶ 62, but he never explicitly says that this was retaliatory conduct, let alone explain how it was. Hagerman is entitled to summary judgment on plaintiff's retaliation claim.

### e.  Hardy

Until June 2017, Hardy served as the center's medical director. [197] ¶ 24. In that role, he supervised the doctors in the unfit-to-stand-trial unit and the center's two assistant medical directors. [187-14] at 24:13–25, 25:18–25, 26:1–13. (The assistant medical directors, in turn, supervise the doctors in the not-guilty-by-reason-of-insanity units. [187-14] at 25:18–24.) Hardy knew that plaintiff had filed grievances and suits against staff, including him, and that plaintiff helped other residents file suits. [205] ¶ 71.

Plaintiff alleges that Hardy transferred him from Hartman Unit to M Unit, [196] at 13, in retaliation for helping Grason with a complaint in her medical-conditions lawsuit, in which she planned to name Hardy as a defendant. [205] ¶¶ 7, 8. But plaintiff cites to no evidence, either in his statement of additional facts or his response brief, to support that assertion. What's more, there is no evidence that Hardy even knew about this suit, which hadn't yet been filed when Hardy informed plaintiff he would be transferred to another unit. *Compare* [205] ¶ 8, [197] ¶ 71 (Grason was still telling people about her plans to file suit in July or August) *with* [197] ¶¶ 73–74 (staff told plaintiff in July that he would be transferred). It is true

38

that Grason told Beyer, her treatment team, and her psychiatrist about her plans to sue. [205] ¶¶ 7, 8. But plaintiff offers no evidence that Grason told Hardy or that Hardy knew about Grason's plans from staff.[41] He therefore cannot satisfy the third element of a retaliation claim against Hardy.

### f. Ingram

From January to July 2017, Victoria Ingram served as acting Forensic Treatment Program Director. [205] ¶ 69. The director oversees the center's security department and court services and tracks patients' movements in and out of the center. [205] ¶ 72. The director also ensures that staff in different departments work together on patient care. [205] ¶ 72. She is "like the chief of operations"; she "makes the hospital work." [205] ¶ 72.

Plaintiff says that Ingram ordered plaintiff's PDA to be confiscated in retaliation for helping Grason and for filing the April lawsuit against center staff. [196] at 14. But he cites no evidence showing she was involved in the confiscation. He says that because the Forensic Program Director is tasked with the above duties, and because Ingram was acting director when the PDA was confiscated, she must be responsible. [196] at 14 (citing [205] ¶ 72). But the job description he cites is too vague reach that conclusion. Plaintiff also cites to the email Ingram sent his father,

---

[41] Plaintiff says Hardy was aware that plaintiff filed grievances and lawsuits against staff, including Hardy himself, and that plaintiff helped other residents with complaints. [205] ¶ 71. In support, he cites to a portion of Hardy's deposition that says just that. [187-14] at 49:5–22; 50:14–17, 24–25; 51:1–4. But Hardy's testimony is not enough to suggest that he knew about Grason's plans specifically, let alone that he knew about them before the transfer.

explaining that his PDA was confiscated because it was contraband. [196] at 14.[42] To the extent plaintiff is arguing that Ingram must have been involved in confiscating the PDA because she sent the email, he is wrong. A jury could not reasonably infer that sending an email about an incident after the fact necessarily meant the sender was involved in the incident itself.

### g.  Malis

Richard Malis was one of plaintiff's treating psychiatrists during plaintiff's time in Hartman Unit. [197] ¶¶ 36, 62. In August 2011, plaintiff met with Malis and Pharis to discuss a grievance and complaint plaintiff filed. [205] ¶ 3. Plaintiff told Malis and Pharis that his treatment team's relationship with him was "adversarial and nature and he tries his best to keep things peaceful." [205] ¶ 4. In response, Malis said, "if [Olsson] wants things to be peaceful, why doesn't he consider how many people against whom he has filed lawsuits." [205] ¶ 4. Plaintiff doesn't say that Malis was involved in any retaliatory acts, so cannot make out a claim against him.

### h.  Pharis

Jeffrey Pharis was Acting Forensic Program Director or Forensic Program Director from 2012 to 2016. [197] ¶ 36. In that role, he had the authority to approve unit transfers when patients' treatment teams recommended them. [187-14] at 47:23–24, 48:2–18. Plaintiff alleges that Pharis transferred him from Hartman Unit to M Unit in retaliation for helping Grason with her medical-conditions lawsuit, which named Pharis as a defendant. *See* [205] ¶¶ 7, 8. Plaintiff relies on a number of

---

[42] See note 13, above.

facts to support his argument. First, for five years, plaintiff repeatedly asked to be assigned to a psychiatrist other than Malis but was rebuffed with "I'll get back to you." [205] ¶ 2. It was only after he began helping Grason, at which point he had stopped asking for a different psychiatrist, [196] at 12–13, that Hardy told him he could have a new psychiatrist—but only if he transferred out of Hartman Unit. [197] ¶ 65. But for a few months before the transfer, plaintiff was able to see a new psychiatrist while still residing in Hartman. [205] ¶ 5. Second, one month after Grason told her treatment team about her plans to file the complaint, staff told Olsson in a meeting that he would be transferred out of Hartman Unit. *See* [196] at 13; [197] ¶ 74. Third, Pharis was present at that meeting, which occurred in July 2015. [197] ¶¶ 73–74, 78. And fourth, after the transfer, center staff members told Olsson he was moved because he gave Grason legal help. [197] ¶ 83.

As with Hardy, plaintiff has not shown that Pharis knew Grason planned to file a complaint against center staff. Pharis was the director or acting director, [197] ¶ 36, not part of Grason's treatment team. Nor does Pharis's presence at the meeting where plaintiff was told he would be transferred say anything about Pharis's role in the transfer or his motive. Further, the comments directly linking the transfer to plaintiff's First Amendment activity are not specific to Pharis. Staff members said plaintiff was transferred because he helped Grason file suit. [197] ¶ 83. In other words, someone transferred Olsson or recommended his transfer out of retaliation. But staff members never indicated who that someone was. Yes, Pharis had to sign off on the transfer. [187-14] at 47:23–24, 48:2–18. But even assuming Pharis knew about

41

Grason's plans, there is no evidence that he approved the transfer because of her plans—a rumor passed along by subordinate staff that was not attributed to Pharis is not enough. Similarly, Hardy's odd explanation that plaintiff could only remain on Hartman Unit if he continued to work with Malis may be enough to suggest pretext for an improper motive on Hardy's part, but Pharis wasn't the one who offered that explanation. (And Hardy wasn't involved in the transfer. *See* [197] ¶ 65.)

In litigation, defendants give an additional explanation for the transfer. They say Olsson was moved because three female residents accused him of sexually inappropriate behavior. [197] ¶ 67. As a result, Malis recommended "many times" that Olsson be transferred to an all-male residence. [197] ¶ 68. But plaintiff denies that he engaged in this behavior, and I credit his denial at this stage. [197] ¶ 68.

Taken together, these facts no doubt look odd. But they are not enough for a legally cognizable retaliation claim; to impose liability under § 1983, Olsson must demonstrate each defendant's personal involvement in the constitutional violation, from knowledge to intent to action. *See Taylor*, 999 F.3d at 493–94; *Gill*, 850 F.3d at 344. Plaintiff does not show that Pharis knew about plaintiff's protected activity, let alone that Pharis approved the transfer because of that activity. Plaintiff therefore cannot make out a claim against Pharis.

### i. Zubik

Thomas Zubik became the Forensic Treatment Program Director in April 2018. [197] ¶ 40. In February 2019, he met with plaintiff to discuss the *Olsson v. Jung-Oliver* legal complaint, in which he was named as a defendant. [205] ¶ 67. He told plaintiff that the center was handling the matter and that further legal action was

N of 43

unnecessary. [205] ¶ 67. In 2020, Zubik met with plaintiff again (while this case was pending) and asked him to stop filing lawsuits and naming Zubik as a defendant. [205] ¶ 68. Plaintiff doesn't point to any retaliatory acts that Zubik took, so cannot make out a claim of retaliation against him.

## V. Conclusion

Defendants' motion for summary judgment, [185], is granted as to plaintiff's access-to-courts claim and as to the defendants that plaintiff no longer pursues. The motion is also granted as to plaintiff's retaliation claims against defendants Beyer, Hagerman, Hardy, Ingram, Malis, Pharis, and Zubik. The motion is denied as to plaintiff's retaliation claims against defendants Dawson and Epperson. The Clerk shall terminate defendants Coleman, Freeman, Dyslin, Corcoran, Giardina, Jackson, Jung-Oliver, Pilario, Beyer, Hagerman, Hardy, Ingram, Malis, Pharis, and Zubik from the caption, and correct it to read Olsson v. Dawson and Epperson.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: April 27, 2022